**Kevin KLEINJAN, by his next friend Walter Kleinjan, and Walter Kleinjan, Plaintiffs and Respondents,**

v.

**Darron KNUTSON, Defendant and Appellant.**

**Civ. No. 8867.**

Supreme Court of North Dakota.

April 13, 1973.

Rehearing Denied May 11, 1973.

Hjellum, Weiss, Nerison, Jukkala & Vinje, Jamestown, for defendant and appellant.

Kenneth M. Moran, Jamestown, for plaintiffs and respondents.

ERICKSTAD, Judge.

The defendant Darron Knutson appeals from a judgment entered in the district court of Stutsman County on July 17, 1972, in which the plaintiff Walter Kleinjan, as the father of the minor Kevin Kleinjan, was awarded $655.45, and the plaintiff Kevin Kleinjan was awarded $2,500, both exclusive of costs. The district judge was the trier of the facts as well as the law.

The court's findings may be summarized as follows:

Kevin, the son of Walter Kleinjan, was born on January 12, 1962; on July 8, 1971, at approximately 12:40 p. m., Kevin was riding his bicycle in a southerly direction on Second Avenue Northeast in Jamestown when his bicycle was struck by an

automobile owned and driven by Darron Knutson, while that vehicle was being driven in an easterly direction on Eighth Street Northeast (the collision occurring in the southwest quadrant of the intersection); the collision was proximately caused by the negligence of Darron, who failed to keep a proper lookout and to yield the right-of-way to Kevin; Kevin was not negligent, since he entered the intersection a distinct and appreciable interval before Darron's vehicle entered the intersection, thus giving Kevin the right-of-way; had there been any negligence on Kevin's part, the doctrine of last clear chance would relieve Kevin of his negligence, making Darron's negligence the sole proximate cause of the collision; as a result of the collision caused by Darron's negligence, Kevin suffered a severe break of his right leg in two places, which injury resulted in hospitalization, medical care, considerable pain and suffering, the wearing of a leg cast and the use of crutches for several months; and as a result of the injuries, Walter Kleinjan has incurred $655.45 in doctor, hospital, optometrist, and ambulance expenses, and Kevin has sustained $2,500 in damages.

Darron specifies as error the following:

"1.

"The Court erred in finding as a fact that Defendant was negligent and that his negligence proximately caused the collision between his automobile and Plaintiff Kevin Kleinjan's bicycle.

"2.

"The Court erred in finding as a fact that Defendant failed to yield the right of way to Plaintiff Kevin Kleinjan.

"3.

"The Court erred in finding as a fact that there was no negligence on the part of Plaintiff Kevin Kleinjan.

"4.

"The Court erred in finding as a fact that Plaintiff Kevin Kleinjan had preempted the intersection, despite the fact that Defendant had the directional right of way.

"5.

"The Court erred in finding that the last clear chance doctrine would apply even if Plaintiff Kevin Kleinjan had been negligent."

On appeal during oral argument Darron's negligence was conceded and specification of error No. 1 abandoned. It is Darron's contention that the record conclusively shows that Kevin was contributorily negligent and that accordingly the judgment should be reversed and the plaintiffs' complaint be dismissed.

Before we undertake to review the evidence in light of the specifications of error, we think it important to note that since amendment of our rules of civil procedure, effective August 1, 1971, the trial court's findings of fact are not to be set aside unless clearly erroneous, and due regard must be given to the opportunity of the trial court to judge the credibility of the witnesses. See Rule 52(a), N.D.R.Civ.P.

It follows that if we are to apply this rule, we must apply as a corollary the rule that is applied in jury cases when the sufficiency of the evidence to support the verdict is questioned, and that is that in determining the sufficiency of the evidence to sustain the verdict (here, judge's findings) the evidence must be viewed in the light most favorable to the verdict. Armstrong v. Miller, 189 N.W.2d 688 at 691 (N.D.1971); Gleson v. Thompson, 154 N.W.2d 780 at 786 (N.D.1967); Degenstein v. Ehrman, 145 N.W.2d 493 at 503 (N.D. 1966).

Viewing the evidence in that light, what do we find?

Julius Wedman, a policeman for the City of Jamestown, testified that he investigated

the accident involving Darron Knutson and Kevin Kleinjan, arriving at the scene of the accident at about 12:45 p. m., July 8, 1971; that the accident occurred at the intersection of Second Avenue Northeast and Eighth Street Northeast; that prior to the accident Darron had been proceeding in a 1966 Chevelle two-door automobile in an easterly direction on Eighth Street, and Kevin had been proceeding in a southerly direction on a bicycle on Second Avenue Northeast; that the avenue at the intersection is 48′ 4″ wide; that when he arrived at the scene, the automobile was resting at the center of the intersection with part of the vehicle north of an imaginary centerline; that the bicycle was found only two feet east of the front of the automobile; that skidmarks were found extending 26′ 9″ to the right rear wheel and 22′ 6″ to the left rear wheel of the automobile; that he talked to Kevin at the scene of the accident and later at the hospital, and that Kevin said that he did not see the vehicle until he collided in the intersection with it, as there was a westbound vehicle on Eighth Street Northeast which blocked his view; that the skidmarks commenced west of the place where the automobile came to rest, wholly within the intersection; that he talked to Darron at the scene of the accident and that Darron told him that he did not see Kevin until he hit him.

Kevin testified that he was nine and a half years old at the time of the accident; that he had just finished the third grade that spring; that he was on the day of the accident on his way to gymnastics and baseball practice at the high school; that as he approached the intersection he saw a blue car coming from the east going west, so he stopped and looked both ways and seeing nothing proceeded into the intersection; that he went straight into the intersection and then was hit; that he was three-fourths careful, maybe one-fourth not careful; that he received mostly A's in school; that he had ridden a bicycle since he was about six years of age; that the bicycle he was riding was a three-speed Sears model; that the blue car was about one-half block to the west of the intersection when he proceeded to enter the intersection (under extensive cross-examination he said, "It was right about down to Nickeus Park", which park is one block west of the intersection); and that he started into the intersection from a stopped position on Second Avenue Northeast about one foot north of the crosswalk.

Darron Knutson testified that he was eighteen years of age at the time of the accident; that he had just finished his sophomore year at Augustana College; that immediately preceding the accident he had been driving his automobile in an easterly direction on Eighth Street; that he slowed down as he approached the intersection with Second Avenue Northeast; that he looked left and right and saw nothing and then proceeded through the intersection; that when he first saw Kevin's bicycle it looked like it was right in front of him; that he put on his brakes and then hit him; that he wasn't looking at the speedometer, but that he would guess that he was traveling fifteen or twenty miles per hour before he started to slow down; that after he slowed down and before entering the intersection he was probably traveling ten to fifteen miles per hour; that at the time he hit Kevin, Kevin was looking directly south and showed no indication of having seen him; that when he saw Kevin he immediately put on the brakes; that he did not see the oncoming blue car testified to by Kevin; that if there was such an oncoming blue car it would not have obscured his vision; that he uses contact lenses but that he wasn't wearing them at the time.

Pertinent is the following part of the cross-examination of Darron:

"Q. Where were you when you first saw the boy?

"A. In the intersection.

"Q. Where in the intersection?

"A. Just entering it, I think.

"Q. You were just entering the intersection?

"A. I think so.

"Q. And where was he?

"A. I was coming into the intersection, and he was in front of me.

"Q. Where was he, relative to the center of the intersection?

"A. Right about in the middle.

"Q. So he obviously had been in the intersection before you; right?

"A. That could be; yes."

Pertinent also is Darron's testimony on cross-examination in which he concedes that he accelerated his car after first slowing down before entering the intersection.

"Q. You testified that you almost came to a stop before you entered the intersection. Why?

"A. Because I slowed down to look both ways, I almost came to a stop.

"Q. Yeah, and you were looking where you were supposed to be—slowed down, looked both ways, and yet you didn't see the boy on the bicycle?

"A. No.

"Q. After you slowed down almost to a stop, did you speed up again?

"A. Yeah.

"Q. So that until you hit the brakes, you were accelerating; is that correct?

"A. Yes.

"Q. Are you able to give an estimate, Mr. Knutson, as to how much time elapsed between your seeing the Kleinjan boy and striking him?

"A. No. It was just a very, very short period of time. I can't give you any number or anything like that."

In light of this evidence, the trial court found that Kevin was not negligent. Viewing the evidence in the light most favorable to the trial court's findings of fact, we cannot say the findings are clearly erroneous.

In support of specification of error No. 3, that the court erred in finding that Kevin was not negligent, Darron refers us to the cases of Schweitzer v. Anderson, 83 N.W. 2d 416 (N.D.1957), and Enget v. Neff, 77 N.D. 356, 43 N.W.2d 644 (1950).

To those two cases could be added a third case, Moe v. Kettwig, 68 N.W.2d 853 (N.D. 1955), if we are to consider three relatively recent decisions involving the care that is required to be exercised by a young child for his own safety.

In each of the three cases, the court held that whether the young child was contributorily negligent under the facts was a question of fact for the jury.

Each case applied the rule that "a child can only be held to that degree of care which ordinarily prudent children of its age, experience and judgment are wont to use under like circumstances". Schweitzer v. Anderson, Syllabus No. 4, 83 N.W.2d 416 (N.D.1957).

In *Schweitzer* the defendant Ardeen Anderson and three of her lady friends left their place of employment in the city of Fargo at about ten minutes to twelve o'clock noon, to go to the Powers Hotel for lunch. With Mrs. Anderson driving her automobile, they proceeded south on Thirteenth or Fourteenth Street to Fourth Avenue North where they turned east. They then proceeded east on Fourth Avenue North to a point about 130 feet east of Tenth Street, where an accident occurred. Woodrow Wilson School was located on Fourth Avenue between Twelfth and Thirteenth Streets. As they passed the school, Mrs. Anderson saw the children who had just been dismissed for noon recess. When they reached the intersection of Fourth

Avenue and Tenth Street, Mrs. Anderson stopped her car for the stop light and thereafter she proceeded to drive through the intersection at a speed of approximately ten to fifteen miles per hour. On the south side of Fourth Avenue east of the intersection were two parked cars. The first car was about 100 feet from the intersection. As Mrs. Anderson was about to drive by the first of these cars, the plaintiff Michael Schweitzer, a seven-year-old boy, ran out from between the two cars. Mrs. Anderson immediately applied her brakes, but did not attempt to avoid striking Michael by turning, "as there wasn't time".

In upholding the jury verdict for Michael, the court said:

"Since the question of negligence on the part of a child of Michael's age requires an evaluation of his capacity, experience and judgment, it is difficult to see how any court could say that a verdict founded upon such considerations could be so clearly wrong that no reasonable man could agree to it. We think the better rule therefore is that the question is one which should be left for the jury." Schweitzer v. Anderson, *supra*, 83 N.W. 2d 416, 420.

■ Applying that rule, giving the trial court's findings in the instant case the same weight as a jury verdict, we conclude that the trial court's findings should be sustained. We cannot say that the judge's "verdict" is so clearly wrong that no reasonable man could agree to it.

We believe that this determination resolves this case; however, lest it be thought that we have not considered specifications of error No. 2 and No. 4, we shall briefly discuss them.

Those specifications are that the court erred in finding as a fact that the defendant failed to yield the right-of-way to the plaintiff and that the court erred in finding as a fact that the plaintiff had pre-empted the intersection despite the fact that the defendant had the directional right-of-way.

In support of these specifications, Darron refers us to two sections of the Century Code. They read:

"39–10–02.1. Persons riding bicycles, animals, or driving animal-drawn vehicles.—In addition to any special regulations, any person riding a bicycle, an animal, or driving any animal-drawn vehicle upon a roadway shall be granted all of the rights and shall be subject to all of the duties applicable to the driver of a vehicle by this chapter, except those provisions which by their very nature can have no application." N.D.C.C.

"39–10–22. Vehicle approaching or entering intersection.—1. When two vehicles approach or enter an intersection from different highways at approximately the same time, the driver of the vehicle on the left shall yield the right of way to the vehicle on the right;

* * *" N.D.C.C.

■ Considering the evidence in the light most favorable to the judge's findings, Section 39–10–22 does not appear to be applicable, the trial court having found that the two vehicles did not enter the intersection at approximately the same time.

■ Whether two vehicles approach or enter an intersection from different highways at approximately the same time is a factual question to be decided by the trier of the facts. In this case the judge was the trier of the facts and it was his view that the bicycle, being a much slower vehicle when operated by a nine-year-old boy from a stopped position, of necessity had to have entered the intersection an appreciable length of time ahead of the automobile to reach the center of the intersection and beyond before being hit by the automobile. We do not think that this was such an unreasonable finding that it should be set aside as being clearly erroneous.

■ Having concluded that the trial court was not clearly erroneous in finding

that Kevin was not contributorily negligent, we need not in this case dwell at length on the specification of error which asserts that the trial court was in error in applying the doctrine of last clear chance.

Sufficient for today, and perhaps as a guide for tomorrow, we quote the opening and closing paragraphs of an article entitled "The Rationale of Last Clear Chance", written by Malcolm M. MacIntyre in 1940, then a member of the faculty of law of the University of Alberta.

"Although origins are obscure and although the word 'negligence' did not always carry the meaning it carries today, it was settled before the advent of the nineteenth century that a defendant was liable in damages for harm caused to a plaintiff by the defendant's negligent conduct.

"Shortly after the turn of the nineteenth century, this liability was subjected to the qualification that a plaintiff's negligence, if contributing to harm resulting from the defendant's negligent conduct, was a complete bar to recovery. This doctrine is well known as a principle of Butterfield v. Forrester (11 East 60 (1809)). But when the courts perceived that this led to unnecessarily harsh results in cases in which the plaintiff was only slightly negligent and the defendant's negligence was comparatively great, a rule was evolved which denied the defense if the defendant's negligence was later, in point of time, than that of the plaintiff. This came to be known as the rule in Davies v. Mann (10 M. & W. 546 (1842)), justified as an exception to the *Butterfield* case on the theory that the plaintiff's negligence was not the proximate cause of the harm. Text writers, and some courts, stressed the time element, and provided an alternative description of the exception to the contributory negligence bar under the name of the last clear chance doctrine. Thus was prevented a clear realization of the underlying reason for the escape from the harshness of the contributory negligence

bar, *i. e.*, that in last clear chance cases the defendant's negligence was relatively greater than the plaintiff's.

\*    \*    \*    \*    \*    \*

"The whole last clear chance doctrine is only a disguised escape, by way of comparative fault, from contributory negligence as an absolute bar, and serves no useful purpose in jurisdictions which have enacted apportionment statutes. The decisions superimposing last clear chance upon these statutes, though understandable historical accidents resulting from the greater fault meaning which the phrase 'proximate cause' had acquired during the common-law struggle to escape from the contributory negligence bar, add injustice as well as complexity to an already confused *corpus juris*. Had the statutes not been thus hamstrung, they would have provided the means of doing openly and more completely what the courts have been doing unavowedly and incompletely ever since Davies v. Mann.

"Every vestige of last clear chance must be swept away in favor of apportionment. \*  \*  \*"

M. MacIntyre, LIII Harv.L.Rev. 1225, 1251, 1252 (1940).

In the instant case, we have a situation which Professor Prosser describes as involving an inattentive plaintiff.

"In another group of cases, the plaintiff's situation is not one of helplessness and he is still in a position to escape, but his negligence consists of failure to pay attention to his surroundings and discover his own peril. If the defendant discovers his danger and his inattentiveness, and is then negligent, most courts hold, with an occasional contrary view, that the plaintiff may recover. It is sometimes said that the defendant has a 'conscious' and the plaintiff an 'unconscious' chance, although obviously neither is 'last' nor 'clear'. There is much the same vague talk of 'wanton' conduct and comparative fault, or of proximate cause; but

here all of the usual explanations and excuses for the doctrine would appear to fall particularly flat. There is the same tendency to avoid any explanation at all, and to lay stress upon the time interval during which the defendant might have done something, as if that were a reason in itself. As to what it is necessary for the defendant to discover, there is further disagreement among courts adhering to the prevailing view. Some of them apparently hold that he must in fact realize the plaintiff's danger and his inattention; the greater number apply a more objective standard, and require only that he discover the situation, and that the danger and lack of attention be apparent to a reasonable man. But the discovery may be proved by circumstantial evidence, and there is in the decisions so much hair-splitting as to whether 'ought to have seen' is equivalent to 'saw' that the result of any particular case is likely to be unpredictable in a given jurisdiction. * * *" Prosser, Law of Torts (4th ed. HB), Ch. 11 Negligence, Defenses, Sec. 66 Last Clear Chance, pages 430, 431.

California, which is considered to be a discovered-peril jurisdiction for purposes of the doctrine of last clear chance, has restated its doctrine as recently as 1957.

"The doctrine of last clear chance may be invoked if, and only if, the trier of the facts finds from the evidence: (1) that the plaintiff was in a position of danger and, by his own negligence, became unable to escape from such position by the use of ordinary care, either because it became physically impossible for him to escape or because he was totally unaware of the danger; (2) that defendant knew that plaintiff was in a position of danger and further knew, or in the exercise of ordinary care should have known, that plaintiff was unable to escape therefrom; and (3) that thereafter defendant had the last clear chance to avoid the accident by the exercise of ordinary care but failed to exercise such last clear chance, and the accident occurred as a proximate result of such failure." Brandelius v. City and County of San Francisco, 47 Cal.2d 729, 306 P.2d 432 (1957).

How we should today apply the doctrine is merely an academic question, as we need not apply it in the instant case, and we may not need to apply it in the future unless a case arises raising this issue before House Bill 1509 of the 43rd Legislative Assembly of North Dakota (1973 Session) becomes effective. House Bill 1509 adopts the doctrine of comparative negligence and, as we have seen, according to some authorities eliminates the need of the application of the doctrine of last clear chance.

For those students of the law who are interested in the development of the doctrine of last clear chance and its application in jurisdictions which have adopted the statute or rule providing for apportionment of damages, we refer them to the following. Gregory, Loss Distribution by Comparative Negligence, 21 Minn.L.R. 1 at 1 (1936–37); James, Last Clear Chance: A Transitional Doctrine, 47 Yale L.J. 704 (1938); Comment, 18 NACCA L.J. 474 (1956); Prosser, Comparative Negligence, 51 Mich.L.R. 465 (1953); Comments, 48 Iowa L.R. 743 (1962–63); Annot., Last Clear Chance Doctrine, 59 A.L.R.2d 1257, 1261.

By way of passing comment, it is interesting to note that our Legislature as early as 1915 recognized the need for apportionment of damages and the repeal of the doctrine of contributory negligence in its Employers' Liability Act affecting railroads. See Chapter 207, Section 2, 1951 Session Laws, now Section 49–16–03, N.D.C.C.

For the reasons stated in this opinion, the judgment of the trial court is affirmed.

STRUTZ, C. J., and KNUDSON and PAULSON, JJ., concur.

TEIGEN, Judge (concurring specially and dissenting in part).

I concur in the result and in the syllabus of the majority except for Syllabus No. 4 and that part of the opinion written to support it.

The majority have given the trial court's findings in this case "the same weight as a jury verdict". The majority have reasoned that, under Rule 52(a), N.D.R.Civ.P., which states that the "findings of fact shall not be set aside unless clearly erroneous, and that due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses,"

"It follows that if we are to apply this rule, we must apply as a corollary the rule that is applied in jury cases when a sufficiency of the evidence to support the verdict is questioned, and that is that in determining the sufficiency of the evidence to sustain the verdict (here, judge's findings) the evidence must be viewed in the light most favorable to the verdict."

This court adopted verbatim the above quoted portion of Rule 52(a) from the Federal Rules of Civil Procedure with the object of attaining uniformity, and also to have the benefit of the decisions of the federal courts interpreting their rules. Wright and Miller, Federal Practice and Procedure, Section 2585, sets forth the results of their examination into the federal cases, and the advisory committee notes, as to the meaning of the "clearly erroneous" rule. It states as follows:

"Rule 52(a) provides that 'findings of fact shall not be set aside unless clearly erroneous.' Thus the findings are presumptively correct. The burden is on the appellant to persuade the reviewing court that a finding was 'clearly erroneous.' In the colorful phrase of one court, the findings 'come here well armed with the buckler and shield' of Rule 52(a).

"This respect for the findings of the trial court cannot be pressed too far. It is simply wrong to say, as one court has, that the 'findings will be given the force and effect of a jury verdict.' History is clear that the draftsmen of the rule rejected proposals to apply the limited review of a jury verdict to findings of a judge. Thus it is not accurate to say that the appellate court takes that view of the evidence that is most favorable to the appellee, that it assumes that all conflicts in the evidence were resolved in his favor, and that he must be given the benefit of all favorable inferences. All of this is true in reviewing a jury verdict. It is not true when it is findings of the court that are being reviewed. Instead, the appellate court may examine all of the evidence in the record. It will presume that the trial court relied only on evidence properly admissible in making its findings in the absence of a clear showing to the contrary. It must give great weight to the findings made and the inferences drawn by the trial judge, but it must reject his findings if it considers them to be clearly erroneous.

"Although there is force to the observation that 'it is idle to try to define' what is meant by 'clearly erroneous', the definition announced by the Supreme Court in 1948 has been reiterated many times by that Court and the courts of appeals and is the definitive test in reviewing findings:

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

"In determining whether a finding is clearly erroneous the rule requires that due regard be given to the opportunity of

**256**

the trial court to judge the credibility of the witnesses. Nevertheless, on the better view, the standard of review set out in Rule 52(a) applies in all nonjury cases and the findings cannot be set aside unless clearly erroneous even though they are based on documentary evidence or on inferences from undisputed facts. The conclusions of law of the trial judge are not protected by the 'clearly erroneous' test.

"The appellate court, in reviewing findings, does not consider and weigh the evidence de novo. The mere fact that on the same evidence the appellate court might have reached a different result does not justify it in setting the findings aside. It may regard a finding as clearly erroneous only if the finding is without adequate evidentiary support or induced by an erroneous view of the law. Insofar as a finding is derived from the application of an improper legal standard to the facts, it cannot stand.

"If a finding is not supported by substantial evidence, it will be found to be clearly erroneous. Some cases state a converse proposition that a finding that is supported by substantial evidence cannot be clearly erroneous. This is not the law. If the findings are against the clear weight·of the evidence or the appellate court otherwise reaches a definite and firm conviction that a mistake has been made, the appellate court will set the findings aside even though there is evidence supporting them that, by itself, would be substantial."

On the basis of this history I am of the opinion that we should adhere to our interpretation of Rule 52(a) as set forth in Kee v. Redlin, 203 N.W.2d 423 (N.D.1972).

However, viewing the evidence in the light which I suggest, I conclude that the trial court's findings of fact must be sustained.