Miles JOHNSRUD and Hal Johnsrud, Plaintiffs and Appellants,

v.

Willis LIND, d/b/a Killdeer Livestock Co., Defendant and Appellee.

Civ. No. 8975.

Supreme Court of North Dakota.

June 4, 1974.

Rehearing Denied June 27, 1974.

Mackoff, Kellogg, Kirby & Kloster, Dickinson, for plaintiffs and appellants.

Greenwood, Moench & Galloway, Dickinson, for defendant and appellee.

PAULSON, Judge.

This is an appeal from a judgment of the Stark County District Court which awarded damages to the defendant-buyer, Willis Lind, on his counterclaim for the breach of a contract for the sale of cattle by the plaintiffs-sellers, Miles Johnsrud and Hal Johnsrud.

In January of 1972, Miles and Hal Johnsrud, who are brothers, purchased cattle to graze on the Fort Berthold Indian Reservation in northwestern North Dakota. The cattle were to be grazed on reservation land leased by the Johnsrud brothers. The lease payments would allow the Johnsrud brothers to run approximately 1,215 head of cattle on the reservation from May 1, 1972, to November 1, 1972.

On July 28, 1972, after various preliminary negotiations between the parties, Mr. Lind and the Johnsrud brothers executed a written contract for the sale of approximately 600 steers at 41¢ per pound and approximately 300 heifers at 39¢ per pound. The sales contract is on a printed form prepared by Mr. Lind. It first acknowledges the partial payment by Mr. Lind of $18,000 toward the purchase price of the cattle, with the balance of the purchase price to be paid upon completion of the contract. After identifying the subject matter of the sales contract according to sex and sales price, the contract reads, in pertinent part:

"These cattle are now located on *Ft. Berthold Range* ☑ Pasture ☐ Feedlot ☐ at *Reservation* and are to remain on same feed until delivered. Delivery to be made from *Oct. 10, 1972,* to *Nov. 1, 1972* . . .

". . . No cattle to be delivered unless railroad cars or trucks are available or in the event of a bad storm, then cattle are to be delivered as soon as possible thereafter." [Emphasized portion is handwritten, remainder is printed.]

The sales contract was signed by Willis Lind, Hal Johnsrud, and Miles Johnsrud.

Mr. Lind then sold his interest in the sales contract to feedlot operators in Colorado, and the same contract was subsequently resold several times.

On October 31, 1972, pursuant to the sales contract, the Johnsrud brothers delivered 341 heifers to Mr. Lind at the Killdeer Livestock Company in Killdeer. Mr. Lind accepted the heifers and paid the full purchase price of $79,999.30 for such heifers to the Johnsrud brothers without deducting the $18,000 partial payment which was made in July, 1972. All parties are agreed that this portion of the sales contract has been fully performed.

The Johnsrud brothers then proceeded to deliver 359 steers to Mr. Lind, pursuant to the sales contract, through November 1,

1972. On that date, when it became apparent that the Johnsrud brothers had not delivered enough steers to fully perform the sales contract, Mr. Lind granted them an extension of time to deliver the remaining steers. Between November 1 and November 4, 1972, the Johnsrud brothers delivered an additional 39 steers which Mr. Lind accepted; and also tendered to him three semi loads of replacement steers from the Fairview, Montana and Rugby, North Dakota, areas, which Mr. Lind rejected.

When Mr. Lind rejected the replacement steers, the Johnsrud brothers demanded payment at the sales contract price for the cattle delivered, or, in the alternative, the return of those cattle. Mr. Lind refused to pay according to the sales contract and, instead, on November 5, 1972, he attempted to ship the cattle to Colorado for resale. Of the four truckloads shipped by Mr. Lind, two were stopped by the Johnsrud brothers and returned to Killdeer, and the remainder were delivered to Blalock & Lind Livestock Company in Greeley, Colorado.

On November 6, 1972, the Johnsrud brothers obtained a temporary restraining order from the Stark County District Court preventing the shipment of the cattle by Mr. Lind, and, on November 13, a week later, the parties entered into a stipulation which, in summary, stated that if Mr. Lind would deposit the sum of $82,500 with the clerk of court, the restraining order would be dismissed.

The $82,500 deposit with the clerk of court was made by Mr. Lind on November 16, 1972, pursuant to the stipulation, and the restraining order was thereafter dismissed. The steers were subsequently sold to Blalock & Lind Livestock Company for 38¢ per pound (254,420 pounds), for a total of $96,679.60 for the 398 steers sold.

On November 16, 1972, the Johnsrud brothers filed a complaint with the Stark County District Court, alleging the conversion of the steers by Mr. Lind, or, in the

alternative, seeking payment for the steers pursuant to the sales contract.

Mr. Lind answered by denying the allegations of the complaint and counterclaimed for damages caused by the alleged breach of the sales contract by the Johnsrud brothers.

On April 24, 1973, the Honorable Emil A. Giese, sitting without a jury, heard the case on its merits and judgment was entered which awarded damages to Mr. Lind for the breach of contract in the sum of $3,408, and which awarded the balance of the $96,679.60 which was obtained by Mr. Lind on the resale of the steers, less the $18,000 partial payment, to the Johnsrud brothers as full payment for the cattle delivered. The remaining balance paid to the Johnsrud brothers pursuant to the judgment was $75,271.60.

In their appeal from this judgment, the Johnsrud brothers raise several issues, most of which involve alleged error in findings of fact by the district court.

The scope of our review of the finding of fact of a district court in a case tried without a jury is limited by Rule 52(a) of the North Dakota Rules of Civil Procedure, which provides, in pertinent part:

"In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment . . . . Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. . . ."

The findings of fact and conclusions of law made by the district court are as follows:

## "FINDINGS OF FACT

### "I.

"That on the 28th day of July, 1972 Plaintiffs and Defendant entered into a written Contract evidenced by Defendant's Exhibit # 1, whereby the Plaintiffs agreed to sell and the Defendant agreed to buy approximately 900 head of cattle; 600 steers at 41¢ [$41] cwt, and 300 heifers at 39¢ [$39] cwt.

### "II.

"That upon the execution of the Contract, the Defendant paid to Plaintiffs the sum of $18,000.00 as partial payment of the Contract price. The balance of the purchase price was to be paid upon the completion of the Contract.

### "III.

"That said cattle were to be delivered to the Defendant between October 10, 1972 and November 1, 1972.

### "IV.

"That in said Contract there is a mutual mistake in that the Contract indicates that the Plaintiffs are to deliver 300 steers at $39.00 cwt. It was the intention of the parties, and there is no dispute between the parties that said Contract should read 300 heifers at $39.00 cwt.

### "V.

"That on October 31, 1972, Plaintiffs did deliver to the Defendant 341 heifers pursuant to the Contract. That upon delivery of said heifers Defendant did pay the full purchase price as agreed in the Contract. That in making such payment Plaintiffs did not deduct the $18,000 that had been pre-paid. That the parties are not in dispute in regard to the heifers.

### "VI.

"That between October 31, 1972 and November 4, 1972, Plaintiffs did deliver from their leased ranges 398 head of steers to the Defendant which were accepted.

### "VII.

"That on the 4th day of November, 1972, the Plaintiffs did attempt to de-

liver to Defendant 177 steers from other sources, specifically Art Zucher, Rugby, North Dakota, and Valley View Feed lot, Fairview, Montana. That said cattle were rejected by the Defendant.

"VIII.

"That after the execution of the Contract referred to above, and prior to the delivery of any steers by the Plaintiffs, the Defendant had sold the steers in advance to Colorado dealers. That said Contract had in turn been sold five or six times since the original transaction.

"IX.

"That of the 900 head of cattle Plaintiffs promised to deliver, consisting of both steers and heifers, they delivered only 739 head, leaving a shortage of 161 head.

"X.

"That because the plaintiffs did not deliver the number of steers promised, the subsequent buyers refused to take delivery of the steers.

"XI.

"That as a result of the failure to deliver the number of steers promised, the Defendant became liable for the feeding and yardage of the 398 steers.

"XII.

"That on a separate arrangement the Defendant did ship 147 head of cattle to Colorado. That he did attempt to ship the balance of the 398 head, but Plaintiffs did cause the trucks to be turned around and unloaded and the Defendant did become liable for 'down time'.

"XIII.

"That as a result of the failure to deliver the number of steers promised, the Defendant lost his commission on 136 steers.

"XIV.

"That the parties hereto entered into a Stipulation whereby it was agreed that upon the Defendant making a deposit of the sum of $82,500.00 with the Clerk of the District Court, said cattle could be sold and any attachment proceedings would be dismissed. That the funds would be disbursed upon the Court's determination.

"XV.

"That said amount was deposited with the Clerk of said Court, and the cattle were subsequently sold for the sum of $96,679.60.

"From the Foregoing Findings of Fact, the Court makes its:

"CONCLUSIONS OF LAW

"I.

"That the Contract between the parties is definite and clear, except to the word approximate, which the Court finds means a near figure.

"II.

"That the intention of the parties is to be gathered from the instrument above, and there is no question as to the intention of the parties.

"III.

"That the Plaintiffs have breached the Contract.

"IV.

"That the Defendant did not convert the cattle to his own use. That he was not obligated to pay the full purchase price until the full lot was delivered. The Plaintiffs did not deliver the full lot in full performance of the Contract.

"V.

"That the Defendant was justified in rejecting those cattle delivered from oth-

er sources because they were not the cattle contracted for.

"VI.

"That the Defendant is entitled to feed costs in the amount of $2,388.00 computed as 12 days at $199.00 per day.

"VII.

"That the Defendant is entitled to the further sum of $800.00 which he has expended for trucking 'down time' as a result of some cattle being stopped in shipment.

"VIII.

"That the defendant is entitled to the further sum of $220.00 for his loss of commission on the delivery of 136 head of steers.

"IX.

"That the damages that defendant may be subjected to from subsequent buyers are indefinite and uncertain, and therefore the Court cannot award any amount.

"X.

"That the Clerk of the Court is directed to disburse the $82,500.00 in the following manner:

"(1) The Clerk shall pay the Defendant his damages in the amount of $3,408.00 plus costs, disbursements and interest.

"(2) The Clerk shall pay to the Defendant the sum of $3,820.40.

"(3) The balance shall be paid to the Plaintiffs.

"(4) The interest that has accumulated on said deposit shall be distributed to the parties proportionately, as their interest appears in said deposit.

. . . . . . ."

The principal issue is whether the Johnsrud brothers breached the sales contract.

The sales contract called for the sale of approximately 600 steers at 41¢ per pound to be delivered from October 10 to November 1, 1972, unless no railroad cars or trucks were available or unless there was a bad storm, in which case they were to be delivered as soon as possible. The steers were identified as being located on the Fort Berthold Reservation range and they were to remain on the same feed until delivered.

On November 1, 1972, when the time for delivery had expired under the terms of the sales contract, the Johnsrud brothers had delivered only 359 steers. After being given an extension of time by Mr. Lind, they delivered an additional 39 steers which were accepted and they then tendered an additional three semi loads of steers which were rejected by Mr. Lind. The district court found that the total number of steers which had been accepted by Mr. Lind was 398.

The Johnsrud brothers first contend that such finding of fact by the district court was in error. They contend that a total of 404 steers was delivered to and accepted by Mr. Lind, including 358 delivered through November 1, and 46 between November 1 and November 4, 1972.

■ The finding of the district court that 398 steers were accepted by Mr. Lind is based on conflicting evidence. It is in a case such as this that due regard must be given to the opportunity of the district court to judge the credibility of the witnesses, for that court had the opportunity to hear and observe those witnesses. Kleinjan v. Knutson, 207 N.W.2d 247, Syll. ¶ 1 (N.D.1973). In the recent case of In re Estate of Elmer, 210 N.W.2d 815, 820 (N.D.1973), we applied the "clearly erroneous" rule to the findings of the district court, and, in our discussion of the application of such rule, we said:

"A finding is 'clearly erroneous' only when, although there is some evidence to support it, the reviewing court on the entire evidence is left with a definite

and firm conviction that a mistake has been made. [Citation omitted.] The mere fact that the appellate court might have viewed the facts differently, if we had been the initial trier of the case, does not entitle us to reverse the lower court."

■ After a perusal of the record in the instant case, we believe that the finding of the district court that the Johnsrud brothers had delivered 398 steers which were accepted by Mr. Lind was not clearly erroneous. In fact, it is supported by the weight slips and brand inspection records which were received in evidence, and by the testimony of the brand inspector. In addition, Mr. Lind testified that he sold all of the steers delivered to him by the Johnsrud brothers to Blalock & Lind Livestock Company. The sales ticket which was entered as evidence of that sale shows the number of steers sold as 398.

Accordingly, we hold that the district court did not err in determining the total number of steers delivered to and accepted by Mr. Lind.

The Johnsrud brothers next contend that the district court erred in determining the subject matter of the sales contract.

The district court concluded that the subject of the sales contract was approximately 600 steers, with the word "approximately" construed as meaning "near". The court then determined that 575 steers would be in compliance with the sales contract provision.

The Johnsrud brothers disagree with this finding and contend that the sales contract, instead, called for the delivery of the lot of steers that the Johnsrud brothers then had on the Fort Berthold Reservation range, which lot was estimated to include approximately 600 head. The Johnsrud brothers rely on the following statement from the Annotation entitled *"Construction and effect of contract for sale of commodity or goods wherein quantity is described as 'about' or 'more or less' than an amount specified"*, which is found at 58 A.L.R.2d 377, at page 390:

"Where, in a contract for the sale of goods, the quantity stated is qualified by the word 'about,' which is supplemented by other stipulations or conditions giving the word a defined or broader scope or significance, it has been held or recognized in a number of cases that the contract was governed by such other stipulations or conditions."

This same rule is stated in 67 Am.Jur.2d, Sales § 167, at pages 283–284, as follows:

"Where the subject matter of the contract is identified by reference to independent circumstances, and the quantity is named with the qualification 'about' or 'more or less,' it has been held or recognized in a number of cases that the contract applies to the specific lot, the courts usually reasoning that the naming of the quantity under such circumstances, with such a qualifying word, is not in the nature of a warranty of the quantity, but is only an estimate of the probable amount, in reference to which good faith is all that is required of the party making it. And where the words are supplemented by other stipulations or conditions giving them a defined or broader scope or significance, it has been held that the contract was governed by such other stipulations or conditions."

The Johnsrud brothers then cite Stanfield v. Arnwine, 102 Or. 289, 202 P. 559 (1921), as an example of a factual situation similar to that in the instant case, where the foregoing rule has been applied. In *Stanfield*, Mr. Arnwine and Mr. Stanfield entered into a written contract whereby Mr. Arnwine agreed to sell to Mr. Stanfield

"about 3,800 head of mixed lambs now being located range and being all of our —my—1918 crop, for the sum of nine & no—dollars per head . . . . .".

When the time for delivery arrived, Mr. Arnwine tendered only 2,800 head of lambs

and Mr. Stanfield refused to accept them because of deficiencies in quality and quantity.

In an action by Mr. Stanfield (the buyer) for breach of the contract, the trial court entered judgment for Mr. Arnwine after a jury verdict in his favor. On appeal, although the Oregon Supreme Court reversed the case for further proceedings, it did hold that Mr. Arnwine had not breached the contract by tendering only 2,800 lambs, provided they were all of his crop of that year.

The factual situation in *Stanfield* is similar to that involved in the instant case—with one important distinction. In *Stanfield*, the number of lambs to be delivered was qualified by the phrase

"now being located [on] range and being all of . . . my 1918 crop".

This language is somewhat similar to the language in the contract involved in the instant case, wherein the cattle to be purchased are identified as *"now located on Ft. Berthold Range"*. However, the distinction between *Stanfield* and the instant case is that the language in *Stanfield* which was considered by the Oregon Supreme Court to constitute a qualification of the "about 3,800 head" to be delivered distinguishes the quoted provision in the Oregon case from the quoted provision found in the sales contract in the case at bar. In *Stanfield, supra* 202 P. at 561, the Oregon Supreme Court said:

"As a preliminary question, consideration will be given to the provision of the contract about the number of lambs to be delivered, concerning which there is much argument in the briefs. The language of the contract in question on this point may be condensed as follows: 'About 3,800 head of mixed lambs, being all of my 1918 crop.' "

The Oregon Supreme Court then relied on the rule stated by the United States Supreme Court in Brawley v. United States, 96 U.S. 168, 171–172, 24 L.Ed. 622 (1877), as follows:

"Where a contract is made to sell or furnish certain goods identified by reference to independent circumstances, such as an entire lot deposited in a certain warehouse, or all that may be manufactured by the vendor in a certain establishment, or that may be shipped by his agent or correspondent in certain vessels, and the quantity is named with the qualification of 'about,' or 'more or less,' or words of like import, the contract applies to the specific lot; and the naming of the quantity is not regarded as in the nature of a warranty, but only as an estimate of the probable amount, in reference to which good faith is all that is required of the party making it. In such cases, the governing rule is somewhat analogous to that which is applied in the description of lands, where natural boundaries and monuments control courses and distances and estimates of quantity.

"But when no such independent circumstances are referred to, and the engagement is to furnish goods of a certain quality or character to a certain amount, the quantity specified is material, and governs the contract. The addition of the qualifying words, 'about,' 'more or less,' and the like, in such cases is only for the purpose of providing against accidental variations arising from slight and unimportant excesses or deficiencies in number, measure, or weight."

In conclusion, on this point, the Oregon Supreme Court said in *Stanfield, supra* 202 P. at 563:

"The tender of 2,800 provided they were all of his crop of that year, was no breach of the stipulation as to number . . . . ."

It is apparent from a careful consideration of the authorities relied on by the Johnsrud brothers that, in those cases

where a qualified quantity such as "approximately 600" was found to be conditioned upon other language in the contract, such language clearly showed that such quantity, though specified, was merely specified as an estimate and was not meant to be a warranty of the quantity to be delivered.

■ The language in the sales contract in the instant case which is relied on by the Johnsrud brothers has no such clear meaning. Instead, it is apparent that the language used was meant to identify the type of feed that the cattle purchased were then on, i. e., range—rather than pasture or feedlot—and to specify that such cattle should remain on that same type of feed until delivered.

After a careful consideration of *Stanfield*, we believe that the rule from *Stanfield* which is relied on by the Johnsrud brothers· is not applicable in the, instant case.

The Supreme Court of Oregon reached a similar result in the case of De Armond v. Fenwick, 127 Or. 509, 272 P. 893 (1928), which also was a case involving the sale of cattle. In *De Armond*, the sellers contracted to deliver an approximate number of certain kinds of cattle as listed under various classifications at specified prices per head. When the sellers attempted to deliver a smaller number of one class of cattle and make up for the deficiency by supplying a larger number of less valuable cattle, the buyer rejected the cattle.

In an action by the buyer for breach of contract, the sellers attempted to justify their actions on the theory that the number of cattle stated under the various classifications was not material because of the recital in the contract that

"This represents all our band and brand excepting yearling heifers and 5 milch cows & calves.".

The trial court in *De Armond* set aside a jury verdict for the sellers and granted a new trial, and the sellers appealed. On appeal, the sellers relied on *Stanfield* as authority for their tender of the cattle. However, the Oregon Supreme Court distinguished *Stanfield* and, instead, adopted the following language from *Brawley, supra* 96 U.S. at 171–172, which had been quoted with approval in *Stanfield*:

"But when no such independent circumstances are referred to, and the engagement is to furnish goods of a certain quality or character to a certain amount, the quantity specified is material, and governs the contract. The addition of the qualifying words, 'about,' 'more or less,' and the like, in such cases, is only for the purpose of providing against accidental variations arising from slight and unimportant excesses or deficiencies in number, measure, or weight."

*De Armond, supra* 272 P. at 895.

The Oregon Supreme Court also said in *De Armond, supra* 272 P. at 894:

"If we adopt the construction placed upon this contract by defendants, it was, indeed, a vain and idle thing to have made any provision whatever for classification of cattle. The word 'approximately' as used in the contract means 'about'; 'very nearly, but not absolutely.' "

*Cf.* Eastern Service Management Company v. United States, 363 F.2d 729, 732 (1966); 67 Am.Jur.2d, Sales § 166, pp. 282–283.

Therefore, considering the language from the sales contract in the instant case, together with the testimony in the record: that the Johnsrud brothers informed Mr. Lind that they had between 800 and 900 steers grazing on the Reservation; that the $18,000 partial payment was computed at $20 per head for 900 head (to wit, 600 steers and 300 heifers); that the Johnsrud brothers made lease payments which would allow them to run 1,215 or more head of cattle; and that Mr. Lind had obligated himself to deliver 600 head of the Johnsrud brothers' steers to subsequent purchas-

ers, we believe that the district court did not err in concluding that the quantity of steers contracted for was approximately 600 head, with the word "approximately" construed as meaning "near".

The district court had before it, not only the written sales contract, but also testimony regarding the prior negotiations of the parties; and Miles Johnsrud's explanation of the use of the term "approximately". We believe that from that evidence the district court correctly determined that the delivery by the Johnsrud brothers of 341 heifers and 398 steers was not substantial performance of their obligation under the sales contract.

The Johnsrud brothers contend, however, that they should have been granted additional time to deliver the cattle, because their roundup of the cattle in October of 1972 was hindered by a bad storm, and that Mr. Lind's failure to grant them such additional time constituted an anticipatory breach of the sales contract.

■ We believe that whether there was, in fact, a bad storm, and, if there was whether that storm was the cause of the Johnsrud brothers' failure to deliver all of the steers contracted for were questions of fact for the district court to decide. The record is conflicting as to whether there actually was a bad storm. However, assuming that there was a bad storm in October, there is no evidence that such bad storm was the cause of the Johnsrud brothers' failure to deliver the steers. In fact the record shows that the Johnsrud brothers were prepared to make full delivery on October 31, 1972, and that when they discovered on November 1, 1972, that they had not delivered the required number of steers, they did not claim that the delay in delivery was because of a bad storm. In addition, no request was ever made to Mr. Lind in October of 1972 for additional time in which to deliver the balance of the steers because of difficulties caused by an alleged bad storm. Accordingly, we hold that the district court did not err when it

did not include a finding that the Johnsrud brothers should have been granted additional time in which to deliver the steers because of a bad storm. We therefore believe that the contention of the Johnsrud brothers that Mr. Lind's conduct constituted an anticipatory breach of the sales contract is without merit.

When the Johnsrud brothers learned that they did not have the quantity of steers on the Fort Berthold Reservation range needed to fulfill the sales contract, they secured replacement cattle and tendered them to Mr. Lind, who rejected such replacement cattle.

■ The Johnsrud brothers contend that those replacement cattle should have been accepted. Although the evidence with respect to the tender of the replacement cattle is conflicting, it is apparent from the record that Mr. Lind contracted to purchase from the Johnsrud brothers a certain quality of cattle which he had inspected and which were to be grazed on the Fort Berthold Reservation range until delivery. After delivery the cattle were to be sent to a feedlot. The record also shows that the replacement cattle rejected by Mr. Lind were not of the same quality as those contracted for by Mr. Lind. While some of the replacement cattle had, at one time, been grazed on the Fort Berthold Reservation range, they had subsequently been kept in a feedlot. The others were pasture cattle. In addition, the record contains unrefuted testimony that the replacement cattle were heavier than the type of cattle contracted for by Mr. Lind. We have carefully considered the entire record and we believe that the district court did not err in finding that Mr. Lind was not obligated to accept the replacement cattle tendered to him.

Accordingly, we conclude that the district court was correct in determining that the Johnsrud brothers had breached the sales contract.

Nevertheless, the Johnsrud brothers contend that the conduct of Mr. Lind when,

without their knowledge or consent, he attempted to sell the steers that had been delivered, constituted wrongful conversion of those steers.

 Under § 41–02–71, N.D.C.C. (§ 2–608, U.C.C.), a buyer of goods has the right to revoke his acceptance of such goods within a reasonable time after he discovers that the goods accepted are nonconforming. Where such buyer has previously made payments to the seller, the buyer then has a security interest in those goods which are in his possession for the amount of any such payments to the seller, and any expenses reasonably incurred in their inspection, receipt, transportation, care, and custody [§ 41–02–90, N.D.C.C. (§ 2–711, U.C.C.)]. In order to protect that security interest the buyer may then resell the goods at a public or private sale and account to the seller for the excess received over the amount of his security interest [§§ 41–02–90, 41–02–85, N.D.C.C. (§§ 2–711, 2–706, U.C.C.)].

In the instant case, Mr. Lind made a partial payment of $18,000 in July of 1972 to the Johnsrud brothers under the sales contract. Pursuant to the sales contract, the balance of the purchase price was to be paid upon completion of the contract. Therefore, when Mr. Lind determined on November 4, 1972, that the Johnsrud brothers were unable to deliver the total of approximately 600 steers in accordance with their obligation under the sales contract, he justifiably revoked his acceptance of those steers which he had previously accepted. Because of his previous partial payment, Mr. Lind acquired a security interest in the steers in his possession for the amount of that partial payment and for any expenses he reasonably incurred in the care and custody of those steers. In order to protect that security interest, Mr. Lind was entitled to resell the steers at a public or private sale.

There is no contention that the sums awarded by the district court to Mr. Lind as damages for the breach of contract were unreasonable.

Accordingly, we hold that the district court did not err in finding a breach of the sales contract by the Johnsrud brothers and in awarding damages to Mr. Lind as the result of that breach.

The judgment of the district court is affirmed.

ERICKSTAD, C. J., and VOGEL, KNUDSON and TEIGEN, JJ., concur.