Jane SCHATZ, Plaintiff and Respondent, and
Edward Schatz, Plaintiff,

v.

Arthur Ben JERKE, Defendant and Appellant.

Civ. No. 8796.

Supreme Court of North Dakota.

July 27, 1972.

Hjellum, Weiss, Nerison, Jukkala & Vinje, Jamestown, for defendant and appellant.

Duffy & Haugland, Devils Lake, for plaintiff and respondent.

PAULSON, Judge.

This action was tried without a jury by the District Court of Ramsey County. The court awarded judgment to the plaintiff, Jane Schatz, in the amount of $13,-732.05, and the defendant, Arthur Ben Jerke, has appealed from such judgment. The action arose out of an accident which occurred at 2:30 p. m. on August 20, 1969, at an intersection in the city of Carrington. There were no traffic signs at the intersection, the weather was clear, and the streets were dry. There were some trees at the northwest corner of the intersection but they would not prevent an eastbound driver from observing a southbound vehicle which was approaching the intersection.

The pickup truck which Mrs. Schatz was driving entered the intersection from the west and the automobile driven by the defendant, Arthur Ben Jerke, entered the intersection from the north. The vehicles collided in the southwest quadrant of the intersection and both came to rest in the extreme southernmost part of the southeast quadrant. The damage to the Schatz pickup truck was to its left front area and the damage to the Jerke automobile was to its right front area.

Mr. Jerke has conceded his negligence, so there are only three issues raised by him which must be considered by this court. These issues are:

1) Was Mrs. Schatz guilty of contributory negligence?

2) Were Mrs. Schatz' injuries permanent?

3) Were the damages awarded excessive?

We will first consider the question of whether Mrs. Schatz was contributorily negligent. It is well established that questions of contributory negligence ordinarily

are questions of fact and become questions of law only when reasonable men can draw but one conclusion therefrom. Schalesky v. Soo Line Railroad, 180 N.W.2d 236 (N.D.1970); Mitzel v. Schatz, 175 N.W.2d 659 (N.D.1970). We have examined the record of this case and cannot say that reasonable men could draw but one conclusion therefrom. Accordingly, the question of contributory negligence in this case is a question of fact.

■ In a case tried without a jury, the trial judge is the trier of facts. In this case the trial judge found that Mrs. Schatz was not contributorily negligent. Rule 52 (a) of the North Dakota Rules of Civil Procedure requires that findings of fact shall not be set aside unless clearly erroneous. The ultimate question then is whether the finding that Mrs. Schatz was not contributorily negligent is clearly erroneous.

■ The evidence shows that Mrs. Schatz had the benefit of the statutory right of way (§ 39–10–22, N.D.C.C.), that she was traveling at a speed of approximately 20 miles an hour, that she looked to the north just prior to entering the intersection, and when she observed that Mr. Jerke was not going to yield the right of way she immediately applied her brakes and attempted evasive action by turning to her right. The record fails to reveal that Mr. Jerke sustained his burden of proof with reference to his allegation that Mrs. Schatz was guilty of contributory negligence, and we therefore conclude that the evidence supports the finding of the trial court and that such finding was not clearly erroneous.

We will consider together the issues of the permanence of Mrs. Schatz' injuries and the excessiveness of damages. The trial court awarded damages in the amount of $13,732.05. Of this amount, $1,732.05 was awarded for special damages, and Mr. Jerke has not contested this award. The remaining $12,000.00 awarded was for general damages, and Mr. Jerke contends that a large part of this award was for what he contends is a nonexistent permanent disability.

There were no medical witnesses present at the trial to give testimony. The only medical evidence given was by deposition. A deposition by Dr. Vincent A. Pankratz, a Minot chiropractor, was introduced in support of Mrs. Schatz' contention. A deposition by Dr. Roger D. Engberg, an orthopedic surgeon from Jamestown, was introduced by Mr. Jerke.

The competency of chiropractic testimony has been recognized by this court in the case of Klein v. Harper, 186 N.W.2d 426 (N.D.1971). Dr. Pankratz treated Mrs. Schatz from June of 1970 to January of 1971 on approximately 27 different occasions in the course of which, according to his testimony, he ". . . made an examination by x-ray, orthopedic tests, neurological tests, blood pressure, urinalysis, hemoglobin, and chiropractic and postural examination". The treatments given to Mrs. Schatz by Dr. Pankratz were designed to alleviate the discomfort from and to correct an abnormal curvature of her spine. Dr. Pankratz was of the opinion at the time of his deposition (on January 27, 1971) that Mrs. Schatz suffered from a 20 to 30 percent permanent disability.

Dr. Engberg examined Mrs. Schatz on December 22, 1970. Dr. Engberg indicated that Mrs. Schatz had a slight curvature of her spine, but that the curvature was of several years' duration. Dr. Engberg also indicated that Mrs. Schatz' prognosis was normal, that she had no disability, and that she did not require any specific treatment.

In effect, the depositions of the medical witnesses were contradictory relevant to the question of the permanency of her disability. Mr. Jerke urges, since the medical evidence was given by deposition rather than adduced by personal testimony before the court, that this court is in just as good a position to consider the integrity, reliability, and candor of the witnesses as was the trial court, and that the finding of the trial court should not be afforded the same

weight as it would if the doctors had testified personally. Mr. Jerke's argument attempts to minimize the effect of the testimony of Mrs. Schatz.

Mrs. Schatz testified that prior to the accident she did not have any disabilities; that she suffered a neck injury as a result of the accident, and that she sought aid at the Carrington hospital directly after the accident, but did not receive treatment at that time. The following day she saw her family doctor in New Rockford. After failing to get relief from her pain from her family doctor she saw a Dr. Lindsay in Fargo who prescribed traction, medication, exercises, and heat. As a result she purchased a vibrator, a home traction kit, and a collar. Mrs. Schatz used these devices for home treatments and also used painkillers, aspirin, and heat. After failing to get relief by these means, she received treatments from a chiropractor in Devils Lake. Obtaining little relief, Mrs. Schatz then went to Dr. Pankratz. She testified that her pain has lessened since she has been seeing Dr. Pankratz, but that the relief is temporary and she has to return to him for treatment periodically. Mrs. Schatz testified that she still suffers from discomfort in her neck, headaches, and loss of sleep; and that she is still unable to perform her normal household and farming tasks. In addition, the medical histories taken by both Dr. Pankratz and Dr. Engberg corroborate Mrs. Schatz' testimony as to pain, cause of injury, and consultations with the various doctors. The other witnesses for the defendant did not refute Mrs. Schatz' testimony with reference to the cause of her disabilities.

■ The trial court found that Mrs. Schatz was permanently injured as a result of the accident and awarded damages accordingly. We are of the opinion that the evidence supports this finding. The trial court was in a better position to observe the demeanor of Mrs. Schatz and due regard must be given to the opportunity of the trial court to judge of the credibility of the witness. Rule 52(a), N.D.R.Civ.P.

In our function as an appellate court we are disinclined to substitute our judgment for that of the trial court in this case where the evidence amply supports the finding of the trial court. We cannot say that the testimony of Dr. Engberg, who made one examination of Mrs. Schatz, is so overwhelming as to negate the testimony of Mrs. Schatz and the opinion of Dr. Pankratz who treated Mrs. Schatz on 27 different occasions.

The question has been raised as to whether the finding of permanent partial disability was based on a mere possibility rather than a probability, contrary to our holding in Vaux v. Hamilton, 103 N.W.2d 291 (N.D.1960). It is urged that Dr. Pankratz' testimony was too indefinite to establish permanent partial disability. In order to consider this contention, the relevant testimony is set forth as follows:

### [DIRECT EXAMINATION]

"Q  Well, now, Doctor, did you have occasion to see a Jane Schatz in your office as a patient?

"A  Yes, I did.

.     .     .     .     .     .

"Q  And what was the history that you obtained from her at that time?

"A  That she was in a car accident on August 20 of 1969 and that their car was hit in the front left fender and she was thrown back in the car.

.     .     .     .     .     .

"A  That she was thrown back in the car quite forcibly at the time of impact. She stated that she had immediate symptoms of her head and neck and shoulder pain. Her history continues she had sought help from a number of other doctors. That she had received no relief for her symptoms. That her condition was progressively getting worse until the time I saw her on June 10 of 1970. Her history also indicates and by her statement that prior to this in-

jury she was capable of working on an equal basis of her own age and had no previous injury to these parts.

"Q Did she state, Doctor, what type of work she was doing at the time or engaged in?

"A Apparently this lady helps her husband on the farm quite a bit with tractor work. She does a lot of tractor work to help him out plus her housewife duties that would be expected with a mother of four children.

"Q Did she make any complaint to you, Doctor, at the time she gave you this history?

"A Yes, she had some definite complaints.

"Q And what were her complaints, Doctor?

"A Her basic complaint was pain in the neck and pain in her right shoulder and pain in the interscapular area.

"Q What you have described, Doctor, would that constitute what is sometimes known as headaches?

"A She had headaches. Also with her complaints she had a swallowing difficulty in many types of food she tried to eat or swallow, seemed to lodge in her throat. Headaches would be one of the symptoms, yes.

. . . . . . .

"Q Now, Doctor, I believe you stated that the plaintiff told you she was engaged in her household work duties and doing certain work in the fields by operating a tractor. Could you tell us, Doctor, what effect her problem would have in carrying out these activities?

"A There is no question in my mind that with the unquestionable nerve root pressure that exists in the neck that the instability would be a detriment and certainly make it impossible for her to do much of the work that she had been able to do before such as tractor work and so forth, and also has created a neurovascular syndrome that has affected a circulatory disturbance in her arms which is manifested by the patient's admission that when working with her arms above shoulder level fatigue some limits her ability to continue.

"Q Now, getting back to my question, Doctor, relative to would you be able to give an opinion as to this plaintiff's disability based on reasonable chiropractic certainty?

"A Yes.

"Q Would you give us your opinion, Doctor, as to the permanent disability that the plaintiff has sustained as a result of this accident?

"MR. VINJE: We will object to the question as no proper foundation and that the Doctor has only made a chiropractic examination of this patient, and we believe that the answer to the question would require something more than a chiropractic examination in that there would be required a complete medical physical and neurological examination by other than a chiropractic doctor.

"A My opinion there exists a 20 to 30 percent residual problem.

"Q And you feel that will be a permanent problem, Doctor, is that right?

"A From the period of observation from June 10 [1970] until January 26 [1971], both subjectively and objectively and during this time I would have to say it could be a permanent situation."

[CROSS-EXAMINATION]

. . . . . .

"Q Thank you, Doctor. Doctor, with regard to the 20 to 30 percent residual problem that you talked about, is this with regard to the particular area of the spine?

"A I never relate one part of the body without effecting the entire body. It is primarily the cervical area I am speaking of. It's relationship to the over-all person is probably one of the most critical areas of the spine.

"Q Are you saying that in your opinion this patient has a 20 to 30 percent residual disability with regard to her entire body then?

"A In regard to her functioning capacity. .

. . . . . .

"Q Then your conclusion is that the disability relates to the entire body and that there would be 20 to 30 percent disability?

"A Yes.

. . . . . .

"Q Now, Doctor, you mentioned that you felt that this could possibly be a permanent disability, is that correct?

"A Yes, this is right.

"Q You're not positive at this time whether it is a permanent disability then or not I take it then?

"A From all of the subjective and objective evaluations to date I would have to say at the present time I feel it is a permanent disability. I have no other reason for saying this right now."

Dr. Pankratz testified at his deposition, taken just prior to the trial, that he believed the disability was of a permanent nature. It should be noted that the deposition was taken in January of 1971, seventeen months after the accident. Dr. Pankratz had treated Mrs. Schatz since June of 1970, so that he had had numerous opportunities to observe her during the period from ten to seventeen months after the accident. In addition to Dr. Pankratz' deposition, the trial court had the opportunity to observe Mrs. Schatz at the trial to aid in determining whether her injuries were permanent.

■ Upon reviewing the evidence, we do not believe that the finding of permanent partial disability was based on expert testimony that indicated merely a possibility of permanency. On the contrary, we conclude that Dr. Pankratz' testimony indicated a strong probability of permanent partial disability. This case is clearly distinguishable from Vaux v. Hamilton, *supra*, because in that case the doctor was asked on direct examination the following question:

"Doctor, can you state with a reasonable degree of medical certainty that there is a distinct possibility that this might happen?"

This question was held to be improper. The only mention of "possibility" in the instant case was introduced on cross-examination by Mr. Jerke's attorney in an attempt to weaken Dr. Pankratz' testimony.

■■ The general rule is that an award of damages will not be disturbed on appeal unless the award is so excessive or so inadequate as to be without support in the evidence. Fowler v. Delzer, 177 N.W.2d 756 (N.D.1970); Froemke v. Hauff, 147 N.W.2d 390 (N.D.1966); Kuntz v. Stelmachuk, 136 N.W.2d 810 (N.D.1965); 22 Am. Jur.2d Damages § 374, p. 483; Annot. 16 A.L.R.2d 3, 369, § 148 (1951); Annot. 11 A.L.R.3d 370, 590, § 19(a) (1967). Since the finding of permanent partial disability has been upheld, we are constrained to hold that there was substantial evidence to support the awarding of $12,000.00 general damages and $1,732.05 special damages.

Mrs. Schatz was 34 years of age with a life expectancy of an additional 37 years and, in perusing the causation and disability testimony, we do not find this àmount of general damages awarded to be excessive or unreasonable. Under Rule 52(a), N.D. R.Civ.P., the findings of the trial court shall not be set aside unless clearly errone- ous. For reasons stated in this opinion the findings of the trial court are sus- tained.

The judgment is affirmed.

STRUTZ, C. J., and KNUDSON, ERICKSTAD, and TEIGEN, JJ., concur.