Willard BLADOW, Plaintiff-Appellant,

v.

Elmer BLADOW, Defendant-Appellee.

Civ. No. 9268.

Supreme Court of North Dakota.

Jan. 27, 1977.

Randolph E. Stefanson (argued), Stefanson, Landberg, Alm & Pitsenbarger, Ltd., Moorhead, Minn., for plaintiff and appellant; Pancratz, Wold & Johnson, P. C., Fargo, of counsel.

Colin Bailey (argued), Bailey & Lies, Wahpeton, for defendant and appellee.

PAULSON, Judge.

This appeal is from the judgment of the district court of Richland County dated June 21, 1976, and from the order of the district court denying the motion of the appellant, Willard Bladow [hereinafter Willard], for amended findings of fact or in the alternative for a new trial.

Willard presents three issues for review in this appeal, which we have combined into one issue: Did the trial court err in concluding that the trespass of Elmer Bladow, the appellee [hereinafter Elmer] upon Willard's property did not have any substantial effect on the drainage of Willard's property during the years 1971, 1972, and 1973, and that Willard, therefore, was not entitled to any damages for crop losses caused by water accumulation for the years 1971, 1972, and 1973?

Willard and Elmer leased and farmed contiguous parcels of land in Brandenburg Township, Richland County, North Dakota, from 1967 through 1973. Willard leased the Southeast Quarter of Section Eighteen, Township One Hundred Thirty-one, Range Forty-nine; and Elmer leased the Northeast Quarter of the same section. The natural drainage from both quarters is to the northeast; thus some of the water standing on Willard's land would naturally flow across Elmer's property. The instant case arose from a dispute between Willard and Elmer concerning the drainage of Willard's property and the location of the boundary line between Willard's and Elmer's property.

The boundary dispute between Willard and Elmer originally arose in 1967. At that time Elmer farmed his northeast quarter south to a point which he called a "dead furrow". In 1967, Willard used a scraper and dug five north-south lateral drains and one east-west lateral drain across his southeast quarter for the purpose of draining surface water more rapidly from Willard's southeast quarter. The surface water was to flow north through the north-south laterals and then into the east-west lateral, which lateral was located at the dead furrow which marked the south edge of the area farmed by Elmer. The east-west lateral permitted the water to flow east into a township ditch located on the east boundary line of Elmer's property and then northward to a culvert located at the northeast corner of the section. Elmer, in the spring of 1968, using a front-end loader, blocked all of Willard's north-south laterals with dirt, preventing the intended flow of water through such laterals in the direction of Elmer's property.

After Elmer had blocked Willard's north-south laterals, Willard had the land surveyed by Adolph Tryba, a registered land surveyor, whose survey located the boundary line between Willard's and Elmer's property at approximately 12 to 15 feet north of the dead furrow previously thought to have been the boundary line between the two quarters. Tryba's survey

also indicated that all of the north-south laterals and the east-west lateral were located within Willard's southeast quarter. Willard testified that he sent Elmer a certified letter stating that the land had been surveyed and that the true boundary line was marked with laths and posts on a line approximately 12 to 15 feet north of the dead furrow to which Elmer had been farming. Elmer testified that he never received such letter, but he admitted having seen the laths and posts, and stated that he assumed that Willard had had a survey conducted and that such laths and posts indicated the true boundary line. From 1967 to the date of the trial, Elmer continued to farm southward to the dead furrow, even though he assumed that a survey indicated that the true boundary line was 12 to 15 feet to the north of the dead furrow.

Willard testified that in 1968, after he had received the results of the Tryba survey, he dug a new east-west lateral approximately 10 to 12 feet north of the dead furrow. Willard further testified that, after he had created this new east-west lateral, he, Willard, "farmed shut" the old dead furrow lateral by plowing across it in the course of the normal cultivation of his land. Willard does not claim that Elmer ever blocked or farmed shut the old dead furrow that originally served as the east-west lateral.

In 1970, Willard instituted a civil action against Elmer alleging wrongful entry and trespass upon Willard's property which resulted in damages to Willard for crop losses due to flooding, for work and labor performed in restoring ditches, and for other unrelated claims. Such action was dismissed on November 21, 1972, on a stipulation of the parties that all matters in issue and dispute between the parties as of April 29, 1970, be dismissed with prejudice.

Willard commenced the instant proceeding on March 12, 1975, alleging, among other claims, that Elmer, without Willard's consent and against Willard's will, had entered upon Willard's property and altered the natural water drainage thereon, causing water accumulation and resulting crop damage on Willard's property in the amount of $13,560.00 for the years 1971, 1972, and 1973. Willard alleges that the drainage from his land was substantially impaired when Elmer continued to farm southward to the location of the old dead furrow. Willard asserts that Elmer's farm implements thus continually crisscrossed the area containing Willard's new east-west lateral, causing such lateral to be farmed shut.

The trial court found that Elmer, in the course of his farming operations, had been trespassing on Willard's property during the years 1970 through 1973 a distance of 12 to 15 feet; that such trespass was willful and malicious; and, as a result, the trial court awarded to Willard $250.00 for the value of the loss of use of such land, and $750.00 in punitive damages. The trial court, however, refused to grant Willard compensation for crop damages caused by water accumulation on Willard's property during the years 1971, 1972, and 1973, the years for which damages are sought. The trial court stated in Paragraph III of its Conclusions of Law:

"That the trespass of the Defendant [Elmer] on the Plaintiff's [Willard's] property did not have any substantial effect on the drainage of the Plaintiff's land and, therefore, the Plaintiff is not entitled to any damages for crop loss."

Willard alleges that such conclusion of law is in error.

In applying our rules on appeals, the initial determination which must be made is whether a particular finding complained of is a finding of fact and subject to the "clearly erroneous" standard of Rule 52(a), of the North Dakota Rules of Civil Procedure, or whether it is a conclusion of law and is fully reviewable by this court on appeal. *Ferguson v. Ferguson,* 202 N.W.2d 760, 763 (N.D.1972); *Schatz v. Jerke,* 199 N.W.2d 908, 910 (N.D.1972); 5a Moore's Federal Practice (2d ed.) ¶ 52.05[1], p. 2693. Whether a particular finding is a finding of fact or is a conclusion of law will be determined by the reviewing court, and labels placed upon the findings by the trial court

are not conclusive. *Gajewski v. Bratcher,* 240 N.W.2d 871, 886 (N.D.1976); *Hegge v. Hegge,* 236 N.W.2d 910, 914 (N.D.1975); *Jahner v. Jacob,* 233 N.W.2d 791, 798 (N.D. 1975); *Stockman's Ins. Agcy., Inc. v. Guarantee Res. L. Ins. Co.,* 217 N.W.2d 455, 463 (N.D.1974), and *Ferguson v. Ferguson, supra* 202 N.W.2d at 763.

■ We find that the facts contained in Paragraph III of the trial court's Conclusions of Law previously set out herein are findings of fact, and are to be reviewed as such.

Willard contends that the evidence before the trial court established that Elmer's trespass upon Willard's property did have a substantial effect upon the drainage of Willard's property during the years 1971, 1972, and 1973; and that Willard, therefore, should be entitled to damages for crop losses caused by water accumulation upon Willard's property for the years 1971, 1972, and 1973. Willard contends that the trial court's findings of fact contained in Paragraph III of its Conclusions of Law are "clearly erroneous" pursuant to Rule 52(a), N.D.R.Civ.P., and that the evidence is insufficient to justify the trial court's decision pursuant to Rule 59(b)(6), N.D.R.Civ.P.

■ Findings of fact by the trial court, in a case tried upon the facts without a jury, will not be set aside by this court unless they are clearly erroneous. Rule 52(a), N.D.R.Civ.P.; *Mattco, Inc. v. Mandan Radio Ass'n, Inc.,* 246 N.W.2d 222, Syll. ¶ 2 (N.D.1976); *Berry-Iverson Co. of North Dakota v. Johnson,* 242 N.W.2d 126, Syll. ¶ 1 (N.D.1976); *Eakman v. Robb,* 237 N.W.2d 423, Syll. ¶ 2 (N.D.1975), and *Kleinjan v. Knutson,* 207 N.W.2d 247, 249 (N.D.1973). Furthermore, in *Eakman v. Robb, supra* 237 N.W.2d at 424, in paragraphs 4 and 5 of the syllabus, we held:

"4. A finding is 'clearly erroneous' only when, although there is some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. The mere fact that the appellate court might have viewed the facts differently, if it had been the initial

trier of the case, does not entitle it to reverse the lower court.

"5. Questions of fact decided by the trial court upon conflicting evidence are not subject to reexamination by the Supreme Court."

■ Willard's contention that the evidence is insufficient to justify the trial court's decision is also restricted to a narrow scope of appellate review. In *Brinkman v. Mutual of Omaha Insurance Company,* 187 N.W.2d 657, 662 (N.D.1971), citing numerous cases in support of its position, this court stated:

". . . when considering whether the evidence is sufficient to sustain the verdict, the evidence must be considered in the light most favorable to the party in whose favor the verdict was rendered."

A perusal of the record reveals substantial evidence in support of the trial court's findings of fact concerning the effect Elmer's trespasses upon Willard's property had had on the drainage from Willard's property. Willard's testimony that he had dug a new east-west lateral (which new lateral was 2 feet deep and from 6 to 10 feet wide) on a line 10 to 12 feet north of the old dead furrow is in direct conflict with other testimony.

■ Elmer testified that at no time was an east-west lateral located anywhere other than at the dead furrow he used as the southern boundary of the area he farmed. Elmer further testified that Willard "cleaned out" the dead furrow in 1967 and deepened it in 1968, but that at no time did Willard move such lateral's location further to the north. Elmer's sons, Mark and Neil Bladow, testified that they were specifically instructed by their father to farm only up to the dead furrow and not to operate equipment so as to pull any dirt into the dead furrow. They further testified that they left the dead furrow unaltered. Harold Fenske, a neighboring landowner, testified that the east-west lateral had remained approximately the same during the years 1967 through 1974. Mr. Fenske testified further that the east-west lateral had not

been plugged or farmed shut during the 1967–1974 period, and, if anything, it had been made deeper by ditching during such period. All parties testified that it would have been to Elmer's disadvantage to have blocked or farmed shut the east-west lateral because to have done so would have caused surface water to have flowed across, rather than around, Elmer's property. We find the foregoing testimony to be substantial evidence in support of the findings of the trial court and to uphold the trial court's decision. Rule 52(a) and Rule 59(b)(6), N.D.R.Civ.P. We decline to set aside the trial court's findings and decision.

The order of the district court denying Willard's motion for amended findings of fact or in the alternative for a new trial, and the judgment of the district court, are affirmed.

ERICKSTAD, C. J., and PEDERSON, VOGEL and SAND, JJ., concur.