Everett KROHNKE, d/b/a Serve & Save Lumber, Plaintiff and Appellant,

v.

George LEMER, Defendant and Appellee.

Civ. No. 9795.

Supreme Court of North Dakota.

Dec. 19, 1980.

Joseph Dietchman, Minnewaukan, for plaintiff and appellant.

McIntee Law Firm, Towner, for defendant and appellee; argued by Joseph C. McIntee, Towner.

ERICKSTAD, Chief Justice.

Because the trial judge died after the trial of this case, but before he was able to render a decision, this case is somewhat unique. Judge Ray R. Friederich tried this case without a jury on May 6 and 7 of 1979 in the Pierce County Courthouse at Rugby, North Dakota. At the close of the trial, he asked counsel for each side to prepare proposed findings of fact, conclusions of law

and order for judgment and submit the same to him for his consideration. Before he could render a decision, Judge Friederich came to an untimely death. This court appointed Harold L. Anderson as a temporary judge and Douglas B. Heen as the Presiding Judge of the Northeast Judicial District assigned this case to Judge Anderson. Through counsel, the parties stipulated that Judge Anderson should decide the case on the transcript of the proceedings before Judge Friederich.

Initially, Everett Krohnke, doing business as Serve and Save Lumber, sued George Lemer to recover $3,183.92 as a balance due on the purchase price of a pole barn which was constructed by Krohnke for Lemer on his ranch near Drake, North Dakota. The complaint is dated the 18th of August, 1975, and is signed by Robert A. Butz as the attorney for Krohnke. Lemer filed an answer and a counterclaim, the essence of which is that the parties agreed that Krohnke should build for Lemer a pole barn on Lemer's premises, 40 feet by 120 feet for the total sum of $6,780, and that $3,600 had been paid on the contract, leaving $3,183.92, the balance to be paid when the building was completed to Lemer's satisfaction. He further alleged that he had informed Krohnke that the building was not properly constructed; that Krohnke agreed to make necessary repairs to the satisfaction of Lemer, but that on the 7th of February, 1975, a large section of the roof collapsed, completely ruining the building; that Krohnke again agreed to make necessary repairs to the satisfaction of Lemer, but that he had not done so; that Lemer was

willing to pay the balance due on the contract as soon as Krohnke completed the building to Lemer's satisfaction, that if he did not do so, it would cost Lemer $5,000 to reconstruct it.

Judge Anderson rendered a memorandum decision on the 9th day of November, 1979, wherein he held that Krohnke's complaint should be dismissed and that Lemer should recover $5,000 on his counterclaim with no interest, his costs and disbursements. Krohnke appeals from the judgment which was entered upon the findings of fact, conclusions of law and order for judgment executed subsequent to the memorandum decision.

As Judge Anderson did not see and hear the witnesses testify, but rendered his decision on the basis of the transcript, we do not apply Rule 52(a) of the North Dakota Rules of Civil Procedure in this case. *See Dolajak v. State Auto. & Cas. Underwriters*, 252 N.W.2d 180 (N.D.1977). Accordingly, we have reviewed the entire transcript in an attempt to determine the facts and have concluded that the judgment rendered upon Judge Anderson's findings of fact, conclusions of law and order for judgment and his memorandum decision should be and is affirmed.

Notwithstanding that we have reached our determination of this case from an independent examination of the transcript and exhibits, we believe it is significant that Judge Anderson concluded that Krohnke was liable, both under his oral warranty of fitness and for improper construction.[1]

---

1. "There is little question but what the barn was constructed in such a manner that it was structurally unsound and unable to perform its function in the ordinary course of usage. Expert testimony produced by Mr. Doug Loos, an expert called by the defendant, who examined the premises on behalf of the defendant's insurance company to try to determine whether or not there was coverage available under his insurance policy, clearly indicates that the manner of construction by the plaintiff was faulty. There was much testimony regarding the ability of the working members of the trusses to bear the weight of the roof, with the plaintiff assuring the defendant during the course of construction and even after the collapse of the

roof, that the roof trusses were adequate to support the barn roof under normal conditions. Plaintiff unequivocally guaranteed the construction of this pole barn to the defendant and thereby overcame defendant's serious concerns about the quality of the roof construction as well as other matters that were of concern to the defendant during the course of the construction of the barn. The plaintiff was the sole decider of the quality and type of construction when he gave such a guarantee to the defendant and it is this Court's opinion that it is almost unnecessary to determine whether or not there was quality construction on the part of the plaintiff in view of the unequivocal guarantee given several times during the course of

The record shows that Krohnke testified that George Lemer wanted to use 2 by 6 lumber for the rafters and 2 by 6 lumber for the trusses, but that Krohnke told Lemer that "it didn't need it." In the building of the pole barn, Krohnke used 2 by 4 lumber for the lower part of the trusses.

Relative to the issue of warranty, the record shows that Krohnke testified that he assured George Lemer that the pole barn would stand a long time but that he did not assure him that it would stand against a 70-mile-an-hour wind and two feet of snow. Notwithstanding that assertion, Krohnke did concede that he told Geoge Lemer that the building would stand until Lemer's three-year-old son was able to take over the farm.

As for the construction of the rafters, the record discloses that Krohnke testified that Adam Lemer, a brother of George Lemer, told Krohnke that the rafters were sagging and that this conversation occurred prior to the collapse of the building on the 7th day of February, 1975. Krohnke's testimony as to his own response to Adam's statement was that, "he was out of his tree."

There is considerable testimony relative to the construction of the rafters. Krohnke testified that three rafters broke after they pulled apart which, he conceded, would indicate, possibly, that they were not glued too well. .The building contained 31 rafters, including the two end rafters. Apparently the end rafters could not be glued together, but of the 29 at least three, if not five, of the rafters were glued at a time different from the other rafters. At one point in his testimony, Krohnke testified that he built all of the rafters in the Drake School Ag room. At another point in his testimony, he asserted that he built the five rafters in his office at the lumber yard and said that he did not remember saying that he had built them in the school.

The issue is important because gluing, to be effective, must be done at a temperature of something like 50 ° Fahrenheit and, thus, if it were done outside in the subzero temperature, the gluing would not hold. George Lemer contended that Krohnke's shop was so filled with supplies and so small that it would be impossible to construct the rafters inside of the shop. Kenneth Richter, a neighbor, said that Krohnke came out to his farm and borrowed a heater in January of 1974 "to glue rafters for George's barn." Krohnke denied that he ever used Richter's heater for such a purpose.

Krohnke's testimony was to the effect that George Lemer had not paid the balance on the barn at the time the roof caved in in February of 1975, although the barn was substantially completed in April of 1974, for the reason assertedly given by Lemer that Lemer had no money to pay the balance.

George Lemer, on the other hand, contended that the reason he hadn't paid the balance of the purchase price of the pole barn was that he was dissatisfied with a number of things including the sagging rafters, that the building was not square, that the doors were improperly constructed, and that the overhang varied from 13½ inches on the west end of the front of the building, to 16½ inches on the east half of the front of the building.

Krohnke testified that he guessed the level of the snow to be 22 inches deep on the 7th of February, 1975, when the roof collapsed, but that he did not measure it. As to the gluing, he further testified that the five rafters in question were supposed to be glued although he did not check them, but, in any case, whether glued or not, they would have broken from the pressure.

George Lemer testified that he agreed to the use of 2 by 6 top cord truss rafters and 2 by 4 bottom cord rafters because Krohnke said it would "stand for my lifetime."

Krohnke apparently commenced the construction of the pole barn in December of 1973 and completed it, such as it was, in April of 1974.

the construction by the plaintiff to the defendant. Nevertheless, the Court does find as a fact that the quality of construction was subpar and not adequate to support the guarantee made by the plaintiff." Memorandum Decision.

George Lemer testified that he told Krohnke he would pay him the balance of the purchase price when he completed the job and that he never told Krohnke that he didn't have any money.

In George Lemer's view, the snow on the roof on the day of the collapse of the roof on February 7, 1975, was 10 inches in the valley and two and a half inches over an area of the roof about 18 by 14 feet. His analysis of the damage to the building on February 7, was that one rafter broke and 11 other rafters pulled apart. He testified that 16 rafters were brought out to the ranch at one time and 13 at another time. He contended that Krohnke told him that the 13 were going to be built in the Vo Ag Building of the Drake School during Christmas and that Krohnke said he had built the others in the same place. When Krohnke didn't use the school over Christmas, Lemer testified that Krohnke told him that he was going to build the other rafters in his warehouse and that he had to wait for warm weather. According to George Lemer, there wasn't enough room in the office to build a 40-foot-span rafter. He contended that Krohnke constructed the rafters in temperatures that were 20 ° below zero. George Lemer said Krohnke used Kenny Richter's heater which is a space heater which puts out 95,000 B.T.U.'s and that that is not enough for gluing, as the glue required temperatures of 50 ° for a period of five or six hours.

Perhaps the most crucial testimony in this case is that of Doug Loos, a consulting engineer from Bismarck with a degree in civil engineering. Mr. Loos examined the George Lemer pole barn on March 4, 1975, at the request of Mr. William Cresap, an insurance adjuster for the company which insured the building against a number of losses, but not against the loss due to a collapsing of the roof. He concluded, after an examination of the barn, that the collapse was due to the failure of a connection between a certain beam and a certain post in the barn. His testimony was as follows:

"A  ... The connection of that beam, if you will, to the post was inadequate to carry the load that was on it. That was where the failure started and that failure at that particular connection caused a portion of the roof to collapse. The collapse threw additional load on to the remaining roof which set up sort of a chain reaction until the roof had relieved itself of enough snow to become secure.

"Q  Did you examine the construction of the truss rafters?

"A  No, I didn't.

"Q  Did you examine the one that was damaged?

"A  I didn't look at the truss rafters. In my opinion that wasn't the primary cause of failure.

"Q  It was the connection to the post?

"A  Yes.

"Q  How was that connected?

"A  It was connected with three nails.

"Q  Do you know the size of the nails?

"A  I think they were 20–penny nails but let me say at this point that I didn't measure them because I didn't think it was important and as you progress in questioning me I will show you why it is not important.

\*    \*    \*    \*    \*    \*

"A  ... I assumed from what I saw at the site that day that there was approximately 12 inches of snow on the roof at that time. And assumed perhaps that that was about the amount that was there when failure occurred. Ordinarily 12 inches of snow would be equivalent to—would weigh 6 pounds a square foot. I also assumed that the weight of the sheeting, the weight of the horizontal joists and the weight of the trusses gave us about another 3 pounds of dead weight. So the 3 plus 6 gives us 9 pounds total on the roof at that time. The building is 40–foot. The base spacing of the poles is 12 feet so from each beam coming in each side we have a tributary roof area of 6–foot by 20–foot.

Six by 20 times 9 pounds per square foot gives a total estimated, and I emphasize that word estimated, load of about 1,080 pounds. Now if these three connectors were 20–penny nails they have a code capacity of 479 pounds. 479 pounds is less than 50 percent of the estimated load on the member. The reason I say the 20–penny nail is irrelevant—even if those would have been 40–penny spikes, which I know they weren't, the capacity would have been 767 pounds according to the code, still less than what I think the load was on the roof at that time. As to what the roof should have been designed for, you haven't asked me but I am telling you, there is nothing really that says what it has been designed for but there are various bulletins put out by NDSU, they recommend a 12–pound or 15–pound. I know there are a lot of 10–pound buildings, particularly metal buildings but some pole buildings, too. If it would have been a 10–pound roof that connection should have been designed for 1,560 pounds which is about 500 pounds more than I estimated was on the connection and surely twice what the connection was capable of carrying even if there were 40–penny spikes in it, which there weren't. So I was satisfied in looking at it that was the primary mode of failure. That is why I didn't look any further.

"Q In other words, they used too small of a spike?

"A It was an improper connection.

"Q Resulting from the size of the spike used?

"A Size and number and the way it was put together.

"Q And that started the reaction of the falling of the roof?

"A That is my opinion.

"Q Have you examined other pole barns of this type?

"A Every one you look at is a little different.

"Q Was this—it was just improperly constructed?

"A That is my opinion."

Relative to the connectors, the testimony of Maurice Becker, the person who was asked by Wayne Heringer, of Heringer Lumber Company, to give him a bid for the cost of labor in repairing George Lemer's pole barn, is that he would have used 50 D pole barn ring shank nails had he been building that barn.

Becker testified that such nails are five and a half inches long with roughly two and a half to three inches of a grooved ring at the bottom of the nail and that at the entry point of the nail it is cupped toward the head to offer resistance once the nail is driven into the lumber.

He said that he would charge just about as much to fix the building as he would to build a new one from scratch. Becker estimated that the labor costs in removing the damaged material and then reconstructing the building with new material would be about $3,000 and that was as of May, 1976. He had built about 100 pole barns in four years and never had one collapse because of snow.

Mr. Wayne Heringer, the lumberman from Washburn, who had a contractor's license and had built at least 75 pole barns operating out of Anamoose and 10 while operating out of Washburn, said that he had had none of his barns collapse. He described the construction techniques similar to those described by Becker and said that he uses the same type of nail as Becker. His testimony was, "even on our walls we use a pole barn nail. We don't use any smooth nails in nailing."

Heringer's estimate of labor and materials to reconstruct the George Lemer pole barn was $10,270. This was after examining the pole barn in May of 1976. He also said that the costs were 25 to 35 percent higher as of the date of the trial.

He estimated the cost of an entirely new building at $11,554. That was for a build-

ing 40 × 120 × 12, whereas the old building was only 10 feet high.

Tobias Lemer, a brother of George Lemer, who was a general contractor and had constructed 15 pole barns, was very critical of the pitch of the roof. He said the roof should have been a 4—12 pitch, which means it should have been a roof with four inches of raise for every foot, whereas in reality it had only two and three-quarters inches of raise for every foot.

He testified that in his examination of the pole barn he found rafters with the nails pulled out and that it was his view that if they had been glued properly, the plywood would have been destroyed before the nails pulled out. These rafters were so constructed that plywood was glued to both sides of the 2 by 4 framing.

We conclude from all of this that the building was poorly constructed in many respects, but that the basic cause of the collapse of the building was the inadequacy of the number and type of nails used in fastening the horizontal beams to the upright posts. Secondary causes may have been the 2 by 4 truss rafters instead of 2 by 6 truss rafters, poor gluing of the truss rafters, and the lack of pitch to the roof.

On the issue of whether or not the doctrine of avoidable consequences should prevent George Lemer from recovering from Krohnke, it is our view that the doctrine does not apply in this case.

This court states the doctrine in this manner in *Nicola v. Meisner*, 84 N.W.2d 702, 705 (N.D.1957):

" 'One who is injured by the wrongful or negligent acts of another, whether as the result of a tort or a breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage, and to the extent that his damages are the result of his active and unreasonable enhancement thereof or are due to his failure to exercise such care and diligence, he cannot recover; or, as the rule is sometimes stated, he is bound to protect himself if he can do so with reasonable exertion or at trifling expense, and can recover from the delinquent party only such damages as he could not, with reasonable effort, have avoided. It is also an elementary principle that a party claiming damages must not be in fault in contributing to them by his own want of proper care; and such care must extend to the protection from further loss after the act complained of. If he fails to use such diligence, his negligence is regarded as contributing to his injury, and, furthermore, such damages as could have been so avoided are not regarded as the natural and probable result of the defendant's acts.'

"This rule is applicable to damages to property, and is stated thus in 15 Am. Jur., Damages, Sec. 40, page 439.

" 'Under the rule requiring one injured by the negligence or wrongful act or omission of another to use reasonable efforts to lessen the resulting damage, it is the duty of one whose property is injured or threatened with injury to take reasonable precautions and to make reasonable expenditures to guard against or minimize such injury; and if he fails to do so, he cannot recover damages for any injuries which by the exercise of reasonable care he could have avoided. In other words, the law will not allow one to sit idly by and see his property destroyed through forces negligently set in motion by another and then collect damages occasioned by his own failure to make reasonable exertion to arrest such disaster.' "

In a subsequent decision, this court applied an exception:

"... the rule ... does not apply where the party whose duty to perform a contract had equal opportunity for performance and equal knowledge of the consequences of nonperformance, such party, while the contract is subsisting and in force, cannot be heard to say that the plaintiff might have performed for him." *Baldus v. Mattern*, 93 N.W.2d 144, 155 (N.D.1958).

*See also Schneidt v. Absey Motors, Inc.,* 248 N.W.2d 792, 796 (N.D.1976).

In this case, when the roof collapsed, George Lemer called Krohnke and informed him of the collapse. Our view of the evidence is that Krohnke promised to repair the roof but that, because Lemer was unwilling to pay him anything more on the purchase price until the roof was repaired, Krohnke declined to repair the roof. When neither party acted to prevent further damage, the entire roof ultimately caved in. There appears to be no denial on the part of Krohnke that on an occasion when Krohnke and George Lemer met in a "local pub," Lemer told Krohnke that he was going to fix up his pole barn and that Krohnke replied, "If you touch that building, I am going to sue you."

Krohnke's response to that apparently is that as he had already sued Lemer in the summer of 1975, threatening to sue Lemer if Lemer acted to repair the barn should not have deterred Lemer from doing what was necessary to prevent further damage to the building.

We do not agree. Under these circumstances, the doctrine of avoidable consequences does not apply.

The judgment is affirmed with statutory costs to Lemer. We do not, however, find the appeal is so without merit that it should be deemed frivolous and thus do not assess costs and attorney fees under Rule 38 of the North Dakota Rules of Appellate Procedure. *See Schell v. Schumacher,* 298 N.W.2d 474 (N.D.1980); *Blue Arm v. Volk,* 254 N.W.2d 427 (N.D.1977).

SAND, PAULSON and VANDE WALLE, JJ., concur.

PEDERSON, Justice, concurring specially.

I concur in the results.

An established saying, source unknown, is: "The exception proves the rule." "*Proves* here does not mean *confirms* but *tests*; that which does not conform to the rule compels us to examine the rule." John Wilson: The Cheats, "To the Reader" (1664).

When a trial court makes findings of fact wholly from documentary evidence, that part of Rule 52(a), N.D.R.Civ.P., which says, "and due regard shall be given [by appeals courts] to the opportunity of the trial court to judge of [sic] the credibility of the witnesses" cannot, under ordinary rules of grammar, be interpreted to mean that when a trial court has no opportunity to judge the credibility of witnesses, the appeals courts should then give "no" regard to the findings of fact which the trial court made.

This perceived exception to the rule turns out to be no exception at all. There is nothing in the rule which implies that "findings of fact shall not be set aside unless clearly erroneous *if* the trial court had an opportunity to judge credibility of witnesses." Justice does not compel that we create an exception as a legal fiction.

*Dolajak v. State Auto. & Cas. Underwriters,* 252 N.W.2d 180 (N.D.1977), was a unanimous opinion which I signed without reluctance. I have cited it without reluctance in my concurring opinion in *Matter of Estate of Koch,* 259 N.W.2d 655, 664 (N.D.1977); and in the unanimous opinions which I authored, *Butts Feed Lots v. Board of Cty. Commissioners,* 261 N.W.2d 667, 669 (N.D. 1977); *Malarchick v. Pierce,* 264 N.W.2d 478, 479 (N.D.1978); and *First Nat. Bank & Trust Co. of Bismarck v. Hart,* 267 N.W.2d 561, 564 (N.D.1978). I have also signed opinions authored by my various colleagues, such as *E. E. Bach Millwork Co. v. Meisner & Co.,* 228 N.W.2d 904 (N.D.1975), which said that we still give deference to the trial court's findings; *Olson v. North Dakota Dist. Court, Etc.,* 271 N.W.2d 574 (N.D. 1978); and *Olson v. Peterson,* 288 N.W.2d 294 (N.D.1980), which cited and applied *Dolajak.*

I often insert dicta into opinions that I write, and I do not refuse to cite or sign opinions authored by others because they contain dicta. But I feel no compulsion to treat dicta as binding precedent. I commend the Chief Justice for his extraordinary efforts and functioning as a trial judge, reaching the same conclusions as were

reached by Temporary Judge Anderson in this case.

The conflicting testimony relied upon by the appellant and pointed out in the majority opinion, only by remote inference in this case, creates a dispute of facts. Undoubtedly, cases will come to this court where the factual dispute is real and direct. In this case Krohnke did not attack any specific finding of fact. See *Sorenson v. Olson*, 235 N.W.2d 892 (N.D.1975). The fact that the testimony is transcribed and the trial judge does not hear it, but only reads it, does not eliminate the need for some weighing in order to resolve the conflicts. In every case, the trial judge should do the weighing and appellate judges should leave it that way unless they are convinced that the trial judge was clearly erroneous in making a specific finding. Many theoretical "what if" questions come to mind. E. g., what if a witness cannot speak but writes answers when questioned on the stand? I, for one, am not sure how the majority opinion will be used to answer that question.

In both trial courts and appellate courts, questions of fact sometimes become questions of law, but not unless reasonable men can draw but one conclusion therefrom. *Schatz v. Jerke*, 199 N.W.2d 908 (N.D.1972). Without just setting up "straw men" for the purpose of knocking them down, consider for a moment what would logically follow if, in trial courts, all documentary evidence be interpreted as raising questions of law only. At best it would confound the practice of law insofar as using, in jury trials, any deposition testimony, answers to interrogatories, or even exhibits with words on them, for fear of opening the door to a claim that a waiver of jury trial is thereby made. After studying the entire transcript, the Chief Justice does not say that reasonable men could not draw a different conclusion than he drew. If that were his statement, then he should also declare the appeal frivolous, as counsel for Lemer suggests, and allow costs and attorney fees under Rule 38, N.D.R.App.P.

I look at the findings of fact prepared by Judge Anderson and, without any regard for his opportunity to judge credibility of witnesses, I conclude that the findings of fact which he prepared are not clearly erroneous. I think the majority opinion ought to say that. My conclusion is not reached after a trial de novo but based upon the appendix, the briefs of counsel, and the oral argument made before us.

My views on Rule 52(a), N.D.R.Civ.P., are not original, in spite of what my colleagues might think. We are just 30 years late in considering the impacts of the matter. A number of judicial scholars have written about this subject. I think William Farnum White aptly covered the apparently on-going dispute in his book, "Winning In Court on the Law of Facts," Prentice-Hall, Inc. (1972), pages 181–183, as follows:

"The federal appellate courts seem to more readily set aside findings as being clearly erroneous where the evidence does not involve 'live witnesses' or where the findings are predicated upon opinions of experts. It is for this reason the character of the record on appeal should be carefully considered in deciding whether you have a fair chance to reverse findings of fact on appeal.

"*Fact Review in the 'Paper Case'*: Because Rule 52(a) contains the admonishment that 'due regard shall be given to the opportunity of the trial court to judge credibility of the witnesses' it was quickly urged that in the case presented upon written documents, or on depositions or on stipulations of fact that the appellate court is free to set aside findings even if they not be found to be clearly erroneous.

"On the one hand, we find what has been called the *Frank* view as expressed by Judge Frank in *Orvis v. Higgins*, (2 Cir., 1950) 180 F.2d 537 at 539:

'(I)f (the trial judge) decides a fact issue on written evidence alone, we are as able as he to determine credibility, and so we may disregard his findings.'

"On the other hand, we find the view of Judge Clark, who drafted Rule 52(a) to the effect that 'clearly erroneous' in Rule 52(a) is the criteria to be applied to all findings of fact irrespective of the nature of the evidence upon which the finding is predicated.

"After itself having gone in both directions on the *Frank* view and the *Clark*

view of Rule 52(a), the Court of Appeals for the Ninth Circuit in a thorough opinion adopted the *Clark* view as the most sound in *Lundgren v. Freeman*, (9 Cir., 1962) 307 F.2d 104. In doing so, it believed that the Supreme Court in *C.I.R. v. Duberstein*, (1960) 363 U.S. 278 [80 S.Ct. 1190, 4 L.Ed.2d 1218] strongly suggested that the *Clark* view was the more appropriate. It also took the position that the *Clark* view of Rule 52(a) would encourage litigants to limit appeals to cases where they were firmly convinced that the trial court had erred on facts rather than upon the idea in a 'paper case' they had a hope that the appellate court might second guess the trial court in their favor.

"It is only by limiting an appellate court to setting aside those findings which are found to be clearly erroneous can the traditional province of the trial court to find facts be preserved. Ability to see and appraise 'live witnesses' is not the only reason for the rule. Litigation upon undisputed facts only arises because the parties with good reason draw different inferences from the same evidence to arrive at different ultimate conclusions. The trial court's experience with the mainsprings of human conduct is just as sound as that of the appellate court and for that reason should be fully respected. [Footnote omitted.]

"While the *Clark* view of the 'paper case' appears the most sound of the two discussed, it just might happen that ultimately an in-between view will be accepted; that is to say, that while the 'paper case' will not be free of the 'clearly erroneous' rule it will be relaxed or modified to some unspecified extent. This idea was expressed in *Cardelis v. Refineria Panama, S. A.*, (5 Cir., 1967) 384 F.2d 589. That a 'paper case' should be treated with less reverence than a 'live witness' case is suggested in the second paragraph of Note 16 to *United States v. General Motors*, (1966) 384 U.S. 127 at 141 [86 S.Ct. 1321 at 1328, 16 L.Ed.2d 415] where the Supreme Court uses the 'paper case' record to justify its holding that certain findings of fact were clearly erroneous:

'Moreover, the trial court's customary opportunity to evaluate the demeanor and thus the credibility of the witnesses, which is the rationale behind Rule 52(a) (see *United States v. Oregon State Med. Soc.*, 343 U.S. 326, 331–332 [72 S.Ct. 690, 694–695, 96 L.Ed. 978]), plays only a restricted role here. This was essentially a "paper case." It did not unfold by the testimony of "live" witnesses. Of the 38 witnesses who gave testimony, only three appeared in person. The testimony, of the other 35 witnesses was submitted either by affidavit, by deposition, or in the form of an agreed-upon narrative of testimony given in the earlier criminal proceeding before another judge. A vast number of documents were also introduced, and bear on the question for decision.

'In any event, we resort to the record not to contradict the trial court's findings of fact, as distinguished from its conclusionary "findings," but to supplement the court's factual findings and to assist us in determining whether they support the court's ultimate legal conclusion that there was no conspiracy.' "