Sandra STECKLER, Plaintiff,

v.

MILLER & HOLMES, INC., a Minnesota
Corporation, Defendant and Appellee,

and

Northern Tank Line, Inc., a Montana
Corporation, Defendant and
Appellant.

Leo SAND, Plaintiff,

v.

MILLER & HOLMES, INC., a Minnesota
Corporation, Defendant and Appellee,

and

Northern Tank Line, Inc., a Montana
Corporation, Defendant and
Appellant.

Kenneth SAND, Plaintiff,

v.

MILLER & HOLMES, INC., a Minnesota
Corporation, Defendant and Appellee,

and

Northern Tank Line, Inc., a Montana
Corporation, Defendant and
Appellant.

Thresa SAND, Plaintiff,

v.

MILLER & HOLMES, INC., a Minnesota
Corporation, Defendant and Appellee,

and

Northern Tank Line, Inc., a Montana
Corporation, Defendant and
Appellant.

Civ. Nos. 9885–9888.

Supreme Court of North Dakota.

March 25, 1981.

Mackoff, Kellogg, Kirby & Kloster, Dickinson, for defendant and appellee; argued by Paul G. Kloster, Dickinson.

Wheeler, Wolf, Peterson & McDonald, Bismarck, for defendant and appellant; argued by R. W. Wheeler, Bismarck.

ERICKSTAD, Chief Justice.

The appellant, Northern Tank Line, Inc., (NTL) appeals from the judgment entered by the District Court of Stark County which determined that NTL was 75% responsible for damages resulting from a fire which occurred when one of its drivers was filling the co-defendant/appellee's, Miller & Holmes, Inc., gasoline storage tank. We affirm the judgment.

This controversy was submitted to the trial court upon stipulated facts. The parties also agreed that the court could view the scene of the fire. The following facts are taken from the facts which were stipulated to the court.

On March 15, 1978, NTL delivered a load of gasoline ordered by M & H. M & H had ordered 4,700 gallons of regular gas and 4,000 gallons of unleaded gasoline. The gasoline was loaded using automatic measuring facilities at NTL's pipeline terminal. When the driver arrived at the station, an employee of M & H informed him that the capacity of the regular storage tank was going to be close. The driver believed this related to the capacity of the tank to hold the 4,700 gallons.

The rig was a straight truck with a tank, which held the 4,000 gallons of unleaded fuel, pulling a trailer loaded with the regular gasoline. The driver began to unload the regular gasoline into the fill pipe to which he had been directed. The driver unloaded three of the trailer's four compartments, holding back 500 gallons in the fourth compartment. He then unloaded that compartment. After unloading his entire load of regular, he backed the rig up and began unloading the unleaded gasoline. He was then informed by a passerby who smelled gasoline that it looked like gasoline was running down the street. The driver then secured a hose and washed the gasoline from the station property. As he finished, he saw flames appear at the basement windows of the house east of the station. This house and lot were owned by M & H and leased to others. The house and contents were destroyed.

The regular tank was measured the morning of March 15 by an employee of M & H. The measurement indicated that the 12,000 gallon tank contained 6,926 gallons leaving a remaining capacity of 5,076 gallons. (While these figures add up to 12,002 gallons, they were the figures stipulated to.) The amount of gasoline sold between the time of measurement and the time of the fire is unknown. The 12,000 gallon regular gasoline tank in question was located on the property on which the house was situated to the east of the M & H station. The capacity of this tank was measured by lowering a calibrated stick into the port directly above the tank and comparing the inches on the stick to a table which converted the inches into capacity in gallons remaining in the tank. This port was a few inches below the concrete surface covered by a small metal manhole cover. The port

leading into the tank was fitted with a lever locking cap. A padlock was available and lay in the hole, but was not in use as it tended to freeze up during winter.

The measuring port and the fill pipe into which the NTL driver unloaded are about 55 feet apart and are separated by a rail fence. After the fire broke out, the cap was found lying beside the measuring port. The measuring port was two feet, eight inches lower than the fill pipe. The driver knew that the measuring port was east of the fill pipe and he assumed that it was lower than the fill pipe. After unloading three compartments, the driver did not attempt to determine how much room was left in the tank nor did he ask anyone from the station to do so before he unloaded the fourth compartment which he had apparently held back, as a precaution to prevent an overflow.

NTL has reported 14 cases in 97,000 loads where its tankers have been loaded with more gasoline by the automatic loading facility than had been ordered. It has also reported 44 cases in 97,000 loads, of overflowing storage tanks.

In this case, it appears that the regular tank overflowed, such overflow somehow ignited, and the house and its contents were destroyed. The tenants of the house sued NTL and M & H for their property losses. The tenants claims were settled and NTL and M & H reserved their cross-claims against each other and M & H reserved its counterclaim for loss of the house and its use against NTL.

Upon the stipulated facts and his view of the scene, two years after the incident, the trial court found:

"16. That NTL through its employee was negligent in failing to properly observe his unloading operation, to locate and observe the measuring port on the tank being loaded, to measure and determine the capacity of the receiving tank to ascertain that it could hold the amount of gasoline he was delivering, for failing to exercise care commensurate with the warning given relative to possible overflow and in otherwise failing to take proper and reasonable care to avoid the spillage and overflow, all of which proximately contributed to the fire and ensuing damage to the extent of 75%.

"17. That M & H was negligent in using a cap on its measuring port which was either defective or not properly latched which proximately contributed to the fire and ensuing damage to the extent of 25%."

## I. SCOPE OF REVIEW

The issues of negligence on the part of NTL and M & H were submitted to the trial court on stipulated facts. In such circumstances, the reasons for applying the clearly erroneous test of Rule 52(a) of the North Dakota Rules of Civil Procedure are not present. *Dolajak v. State Auto & Cas. Underwriters*, 252 N.W.2d 180, 182 (N.D. 1977). We have also said that Rule 52(a) does not apply when a substitute judge renders a judgment on the basis of a trial transcript when the trial judge died after hearing the case but before he could render a decision. *Krohnke v. Lemer*, 300 N.W.2d 246, 247 (N.D.1980).

In this case, however, although the case was decided on stipulated facts, the trial court did view the scene of the fire. In *Dobler v. Malloy*, 214 N.W.2d 510 (N.D. 1973), we said:

"While we have never ruled on whether a view by a jury is in itself evidence or whether a jury view is allowed solely to enable the jurors better to understand the situation and apply the evidence in the case [see 89 C.J.S. Trial § 464, pp. 100–102, for statement of opposing views], we do observe that we believe a view by the trial judge serves the same function as a jury view and that, at the very least, it provides one more reason (in addition to his opportunity to observe the demeanor of the witnesses) why we should give great weight to the findings of the trial court." 214 N.W.2d at 514–15.

In *Dobler*, the trial judge, in addition to viewing the scene, also heard testimony of the witnesses and acted as the trier of fact.

In the present case, all facts were stipulated, but the parties must have believed that a view by the court would enable it to better understand the situation and apply the law to the stipulated evidence. The view, however, was two years after the incident and only after the house and fence had been removed and the lot incorporated into the station property of M & H. It seems that the scene is more accurately captured by the photographs of the scene at the time of the fire and shortly thereafter than by a view of the scene two years later when important reference points were removed. Therefore, we will not apply the clearly erroneous test of Rule 52(a), N.D.R. Civ.P., but we will give the trial court's finding appreciable weight in this case.

## II. DETERMINATION OF LIABILITY BETWEEN NTL AND M & H

■ In its brief, NTL asserts what it believes to be numerous errors by the trial court in its findings of fact and determination that NTL was 75% responsible for the damage. The issues of negligence, proximate cause and contributory negligence are questions of fact for the trier of fact. *Moser v. Wilhelm*, 300 N.W.2d 840, 842 (N.D. 1981).

In *Chicago, M., St. P. & P. R. Co. v. Johnston's Fuel Liners*, 122 N.W.2d 140 (N.D.1963), we reinstated a jury verdict finding both the gasoline carrier and the party who received the gasoline to be joint tortfeasors after the trial court entered judgment notwithstanding the verdict against the carrier alone. In that case, after the bulk station owner ordered the fuel, Johnston's Fuel Liners' driver and the owner's son worked together to unload the tanker. A coupling was missing and the son obtained the necessary piece and unlocked the valves and helped connect the hoses and pump. Neither driver nor son measured the receiving tank. After pumping operations began, the owner arrived and his son left. The owner questioned use of the gasoline-powered pump, but did not offer use of his own electric pump. Subsequently, the tank overflowed and the pump

was shut off. To stop the engine on the pump, a metal strap was depressed to short out the spark plug. It appears that the resulting spark ignited the gasoline vapor and a fire resulted. As to the duty of the parties, we said:

"Both the defendant and the third-party defendant had a duty to exercise such care as reasonable men would have exercised in the handling of a commodity which was potentially dangerous if mishandled, so that non-negligent persons owning or using property on adjacent premises would not be damaged by the failure to use such care on the part of said defendants." 122 N.W.2d 145.

In that case, the overriding factor was that the parties acted jointly in unloading the gasoline.

■ In the present case, NTL's driver undertook to unload the fuel by himself as he had done other times even after he was warned that the capacity would be close. No employee of M & H assisted in the unloading process, nor were any of the employees asked by the driver to assist. The driver knew that the tank and measuring port were located elsewhere and assumed that the measuring port was lower than the fill pipe. Thus, if the tank were to overflow, it would do so at the measuring port and not at the fill pipe unless the measuring port cap was on securely and was leakproof. The cap, however, was either not on or else was defective as it was found lying beside the measuring port after the overflow.

The stipulated facts are that there was room for 5,076 gallons of regular fuel in the regular storage tank, and that the driver loaded 4,700 gallons of regular gasoline into the trailer. If both of these facts had been true, there could not have been an overflow. The stipulated facts also are that the driver backed the rig up to unload the unleaded gasoline into another port. Therefore, the unleaded gasoline could not be a cause of the overflow of the regular storage tank. The stipulated facts do not contain any basis upon which we may attribute liability to either party for an error in measuring

the capacity of the storage tank or the measuring of the load in the tanker.[1]

It does appear that the fire could not have occurred had not both NTL and M & H been negligent. If M & H had properly placed the cap upon the measuring port and had the cap remained securely in place, the fuel would have overflowed at the fill pipe where the driver could have seen it and shut the flow off. The driver should have exercised care to prevent an overflow after being warned that the capacity would be close. He did hold back 500 gallons, but then, without any further precautions, he also simply dumped that into the receiving tank. He could have ascertained the location of the measuring port and measured it himself or he could have asked one of M & H's employees to do so, but he did not, even after the warning that it would be close.

NTL refers us to *Fritsch v. Atlantic Refining Co.*, 307 Pa. 71, 160 A. 699 (1932). Except for one important distinction, the facts of that case are remarkably similar to the facts of this case. In *Fritsch*, the driver was filling the station's tank which was located in the basement. The fill pipe was outside the building and there was a measuring port inside the building. The cap had been left off of the measuring port and the tank overflowed. In that case, the Supreme Court of Pennsylvania determined that the driver was not negligent in filling the tank and had no duty to anticipate that someone from the station would negligently leave the cap off of the measuring port. The court referred to 45 Corpus Juris at 705 and said:

> "One is not under a duty of anticipating negligence on the part of others, but, in the absence of anything which gives or should give notice to the contrary, a person is entitled to assumed and to act on the assumption, that others will exercise ordinary care for their own safety." 160 A. at 700–701.

In this case, the driver had notice that the storage tank might not hold all of the gasoline. He knew the measuring port and tank were located elsewhere and assumed that they were lower than the fill pipe; he did not request assistance to measure the remaining capacity before he dumped the 500 gallons he had held back specifically to prevent an overflow. Even though we agree with NTL's contention that it was impossible for the driver to maintain a careful watch over both the fill pipe and the measuring port over the tank, we do not believe that he exercised the care that a reasonable man would have exercised in the handling of the potentially dangerous gasoline. *Chicago, M., St. P. & P. R. Co. v. Johnston's Fuel Liners, supra,* 122 N.W.2d at 145.

It is also uncertain whether or not the cap on the measuring port was simply not replaced or was defective. In either case, M & H was negligent in using an inadequate cap or in failing to replace the cap. Such negligence would have been irrelevant had the tank not been overfilled by the NTL driver. We do not find that the driver's negligence was an intervening cause sufficient to relieve M & H of its negligence, as there is some basis for the contention that, had an adequate cap been securely placed upon the port, the gasoline would not have overflowed at the tank. Likewise, we do not believe that M & H's negligence was an intervening cause sufficient to relieve NTL of its negligence in overfilling the tank. (For a discussion of negligence, proximate cause and intervening causes, *see Johnston's Fuel Liners, supra,* 122 N.W.2d at 148; and *Knorr v. K-Mart Corp.*, 300 N.W.2d 47, (N.D.1980).)

We agree with the apportionment of negligence which the trial court assigned to

---

1. It is interesting to note that the judgment roll contains answers by NTL to interrogatories of M & H which indicate that the trailer which contained the regular fuel had four compartments which had the following capacities: No. 1—1,605 gallons; No. 2—525 gallons; No. 3—717 gallons; No. 4—2,145 gallons. The total capacity of the trailer, therefore, was 4,992 gallons.

We have not considered these capacities in our determination of this appeal as these capacities were not included in the stipulation of the facts.

each of the parties. The judgment assigning 75% responsibility to NTL and 25% to M & H is affirmed.

VANDE WALLE, SAND and PAULSON, JJ., concur.

PEDERSON, Justice, concurring in the result only.

The only way that I can reach the result which was reached by Chief Justice Erickstad is to apply Rule 52(a), NDRCivP.

The essential findings of fact on the issues of negligence, proximate cause and comparative negligence (§ 9–10–07, NDCC), upon which the conclusions of law, order for judgment, and judgment rest, are found in findings numbered 16 and 17 as follows:

"16. That NTL through its employee was negligent in failing to properly observe his unloading operation, to locate and observe the measuring port on the tank being loaded, to measure and determine the capacity of the receiving tank to ascertain that it could hold the amount of gasoline he was delivering, for failing to exercise care commensurate with the warning given relative to possible overflow and in otherwise failing to take proper and reasonable care to avoid the spillage and overflow, all of which proximately contributed to the fire and ensuing damage to the extent of 75%.

"17. That M & H was negligent in using a cap on its measuring port which was either defective or not properly latched which proximately contributed to the fire and ensuing damage to the extent of 25%."

Although these are "conclusory" findings, they are adequate and necessary and are supported by facts that were stipulated to. Accordingly, they are not clearly erroneous. Insofar as conclusory findings are based on "inferences drawn from documents or undisputed facts, . . . Rule 52(a) . . . is applicable." *United States v. United States Gypsum Co.*, 333 U.S. 364, 394, 68 S.Ct. 525, 541, 92 L.Ed. 746.

Since § 28–27–32, NDCC, was repealed in 1971 and no appellate rule has been enacted reinstating trial de novo as a standard of review, I cannot agree with the use of the following words in the majority opinion:

"The stipulated facts do not contain any basis upon which *we* may attribute liability . . . ." [Emphasis added.]

" . . . *we* do not believe that he exercised the care that a reasonable man would have exercised . . . ." [Emphasis added.]

"*We* do not find that the driver's negligence was an intervening cause . . . ." [Emphasis added.]

" . . . *we* do not believe that M & H's negligence was an intervening cause . . . ." [Emphasis added.]

"*We* agree with the apportionment of negligence . . . ." [Emphasis added.]

These are all words we might well use in a trial de novo. But if I were substituting my judgment for that of the trial court in this case, I would not have attributed the negligence on a 75%–25% basis.